Guillermo H. OBREGON, Appellant,

v.

UNITED STATES, Appellee.

No. 79–369.

District of Columbia Court of Appeals.

Argued April 24, 1980.

Decided Nov. 6, 1980.

---

Russell F. Canan, Washington, D. C., appointed by the court, for appellant.

Elliot R. Warren, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Michael W. Farrell and Martin J. Linsky, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY and HARRIS, Associate Judges, and HARRIETT R. TAYLOR, Associate Judge, Superior Court of the District of Columbia.*

KELLY, Associate Judge:

Appellant appeals from his convictions of first–degree murder, D.C.Code 1973, § 22–2401, and carrying a pistol without a license, D.C.Code 1973, § 22–3202, arguing that the trial judge erred in (1) denying his motion to dismiss the indictment; (2) allowing the government to present certain rebuttal testimony; and (3) denying his motion for a mistrial. We find no error and affirm.

Appellant was arraigned in Superior Court on August 4, 1978 for the May 10, 1978 murder of Bobby Williams. Before trial, appellant filed a motion to dismiss his indictment, claiming that the grand and petit jury selection processes for the District of Columbia courts violated the equal protection component of the Fifth Amendment,[1] the Sixth Amendment right to trial

---

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

1. It is by now well established that the due process clause of the Federal Constitution con-

by a jury drawn from a fair cross section of the community, and the Federal Jury Selection and Service Act, 28 U.S.C. §§ 1861 to 1875 (1976 & Supp. 1978).[2] At the hearing on the motion, appellant presented statistics showing that, although Spanish–surnamed persons constituted 2% of the population of the District of Columbia,[3] they comprised an average of only .11% of grand jury venires and .46% of petit jury panels over the period of 1973 to 1978. He also offered computations to show that the probability that the underrepresentation happened by chance was, at best, minimal.[4]

In opposition to the motion, the government called the chairman of the District of Columbia Jury Commission to explain the jury selection process. The primary repository of names for potential jury service, the source list, contains 476,600 names derived from the District of Columbia voter registration and motor vehicle registration lists.[5] From this pool, a master list, generally containing 50,000 names, is compiled by a computer that arranges the list alphabetically and selects names by use of a constant quotient number.[6] From the master list, a working list of 10,000 names is compiled in the same manner. Questionnaires are then sent to the 10,000 names on the list and returned to the Jury Commission office.[7] At this point, the Commissioners remove those questionnaires indicating that the person is disqualified by statute [8] or exempt

tains an equal protection component. Over a quarter century ago, the Supreme Court wrote that

> The Fifth Amendment, which is applicable in the District of Columbia, does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states. But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The "equal protection of the laws" is a more explicit safeguard of prohibited unfairness than "due process of law," and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process. [Footnote omitted.]

*Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *See Fullilove v. Klutznick*, —— U.S. ——, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

2. 28 U.S.C. § 1861 states:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1862 provides:

> No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status.

3. The trial judge took judicial notice of the fact that, according to 1970 United States Census figures, the total population of the District of Columbia is 756,510, and 15,108 of these are of Hispanic origin. Although appellant's expert testified that Hispanics may be significantly undercounted in the census and might number as high as 50,000 in the District, the trial judge chose to rely on the census figures. We accept the judge's choice on review.

Appellant's statistics were arrived at by comparing the names on post–summons grand jury venires and petit jury panels with a list of 8,000 Spanish surnames maintained by the United States Bureau of the Census.

4. Appellant's probability statistics for grand juries were less than 1 in $10^{11}$ and for petit juries, less than 1 in $10^{71}$.

5. Duplicate names are removed.

6. To arrive at the quotient number, the total number of names on the source list is divided by the number of names necessary to satisfy the courts' jury requirements. For example, if 50,000 names are needed for the master list, and there are 500,000 names on the source list, the quotient is 10. To obtain a starting number, the numbers 1 through 10 are placed in a box, the box is shaken, a Jury Commission clerk holds the box, and another clerk chooses a number in the presence of the three Jury Commissioners. If the number chosen is 3, for example, the third name on the source list is selected for the master list, as is the thirteenth, the twenty–third, and so forth.

7. The computer produces a finished, addressed questionnaire; the Commissioners do not select the names for mailing.

8. D.C.Code 1973, § 11–1901 provides that juror qualifications in the District of Columbia courts

from service,[9] and the remaining names are returned to the computer. From this qualified jury wheel, names are again randomly selected to receive summonses in response to estimated juror requirements provided by the courts.

After the testimony and arguments by counsel, the trial judge denied appellant's motion, ruling that, under the applicable case law, he had failed to present a prima facie case of a Fifth Amendment, Sixth Amendment, or statutory violation.[10]

At trial on the merits, the evidence showed that, on May 10, 1978, appellant got into a fight with the victim, Bobby Williams, at their place of employment, an underground construction site near the 5600 block of East Capitol Street, S.E. A co-worker broke up the scuffle. Appellant then went to the crew's paymaster, stating that he had to shoot Williams[11] and asking

if the company would get in trouble if he did.

Appellant returned to the construction shaft, where Williams and several others were standing, and was stopped by the foreman, Thomas Bradshaw. While Bradshaw was trying to calm appellant, appellant suddenly drew a pistol from his pocket, pushed Bradshaw aside, and fired numerous shots at Williams.

The government presented six witnesses to the shooting, several witnesses to the events leading up to the shooting, the testimony of the arresting officer who recovered appellant's gun from the shaft, the testimony of a firearms examiner who connected the slugs in Williams' body to appellant's gun, and the testimony of a medical examiner who established that Williams died from multiple gunshot wounds.

shall be governed by 28 U.S.C. § 1865. That section states that one is not qualified for jury service if he or she:

(1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3) is unable to speak the English language;

(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

9. Pursuant to the Modified Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors [Modified Plan], applicable to the selection of jurors in the Superior Court, the following categories of persons are exempt from jury service:

1. Members in active service in the Armed Forces;

2. Members of the fire and police departments of the United States and the District of Columbia; and

3. Public officers in the executive, legislative or judicial branch of the government of the United States, or government of the District of Columbia, who are either elected to

public office or directly appointed by one elected to office.

The Modified Plan also provides that the following persons may be excused on request:

1. Persons over 70 years of age;

2. Nurses in active practice;

3. Persons actively engaged as ministers of religion, or clergymen, of any denomination;

4. Persons who have served as grand or petit jurors in the District of Columbia within four years;

5. Persons actively teaching or supervising in public, private, or parochial school or college;

6. Persons required at home to care for children under ten years of age, or for a disabled person who cannot be left alone, where there is no other family member available to provide substitute care;

7. Self-employed in a "one person" business;

8. Attorneys admitted to practice before any Court, State or Federal and all or part of whose time is spent in advising, interpreting, or applying the law;

9. Physicians and surgeons in active practice; and

10. Dentists in active practice.

Members of these classes are not, however, required to request excuses.

10. See note 19 infra.

11. Appellant also stated that he had to shoot Charlie Williams, the victim's cousin who was also involved in the fight.

Appellant argued that he shot Williams in self–defense and that he acted without the premeditation necessary to substantiate the charge of first–degree murder. In support of his defense, he presented the testimony of his supervisor that Williams had repeatedly harassed appellant and had threatened to stab him on at least one occasion. Testifying in his own behalf, appellant admitted that he was angry with Williams on the day of the shooting, but stated that he only shot him because he thought Williams had a knife.

The jury found appellant guilty as charged and he was sentenced to imprisonment for a term of twenty years to life for the murder count and three to twelve months for the pistol charge.

### I

Relying heavily on *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), appellant argues that the grand and petit jury selection process in the District of Columbia courts violates his Sixth Amendment right to be tried by a jury chosen from a pool that represents a fair cross section of the community, the equal protection component of the Fifth Amendment, and the Federal Jury Selection and Service Act of 1968, *supra.* We discuss each of the allegations.

### A. *The Fair Cross Section Requirement*

 Fundamental to the Sixth Amendment right to trial by an impartial jury is the right to have both grand [12] and petit juries chosen from sources representing a fair cross section of the community.[13] *Duren v. Missouri, supra* at 358–59, 99 S.Ct. at 665–666; *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). In *Duren,* the Supreme Court fashioned a three–part test for establishing a prima facie case of a fair cross section violation.

[T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury–selection process. [439 U.S. at 364, 99 S.Ct. at 668.]

Once the challenger has made out a prima facie case, the burden shifts to the government to show that "attainment of a fair cross section [is] incompatible with a significant state interest." *Id.* at 368, 99 S.Ct. at 670.

 Without deciding whether appellant met the first two prongs of the *Duren* test,[14] we agree with the trial judge that he

---

12. The source of the fair cross section requirement for grand juries is actually the Fifth Amendment right to an indictment by a grand jury. *See Castaneda v. Partida, supra* at 510, 97 S.Ct. at 1288 (Powell, J., dissenting). However, the same constitutional principles apply to both grand and petit juries. *Alexander v. Louisiana,* 405 U.S. 625, 626 n.3, 92 S.Ct. 1221, 1223 n.3, 31 L.Ed.2d 536 (1972).

13. For an excellent discussion of the fair cross section requirement and its slow evolution into a constitutional principle, see Daughtrey, *Cross Sectionalism in Jury Selection Procedures after Taylor v. Louisiana,* 43 Tenn.L.Rev. 1, 19–50 (1975).

14. The trial judge ruled that Spanish surnamed persons were a "distinctive group." It is true that they have been found to be a cognizable class for equal protection purposes, *Castaneda v. Partida, supra; Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), but even

that designation is a question of fact to be decided on a case by case basis by looking at the characteristics of the particular community in question. *Hernandez v. Texas, supra* at 478–79, 74 S.Ct. at 670–71. "Distinctive" for purposes of the fair cross section requirement may or may not be defined in the same manner. *See Taylor v. Louisiana, supra* at 537–38, 95 S.Ct. at 701 (fair cross section principle must have much leeway in application). The *Duren* Court spoke in terms of a group "of sufficient *magnitude* and distinctiveness so as to be within the cross–section requirement...." 439 U.S. at 370, 99 S.Ct. at 672 (women who constituted 54% of the adult population of county found to be "distinctive") (emphasis added). In *Taylor,* the Court noted that the fair cross section principle is defeated where "*large,* distinctive groups are excluded from the pool." 419 U.S. at 530, 95 S.Ct. at 697. (Women who composed 53% of population eligible for jury service were "distinctive" group) (emphasis

failed to show that the underrepresentation was due to systematic exclusion of the group.

Citing to *Duren,* appellant argues that, by merely showing that a high comparative disparity existed over a long period of time and that the underrepresentation probably did not happen by chance, he proved that the exclusion was systematic.[15] We do not read *Duren,* so broadly as to hold that a statistical showing alone, without some analysis of the particular system involved, is sufficient to prove systematic exclusion. The Court went on to point out that, not only had the petitioner there shown a statistical underrepresentation, but he had also shown exactly *when* in the selection process and *why* the exclusion occurred. *Id.* at 366–67, 99 S.Ct. at 669–670.

Moreover, appellant's case is significantly factually distinguishable from those presented in *Duren* and *Taylor v. Louisiana, supra,* another case appellant heavily relies upon. In *Duren,* women constituted 54% of the total adult population of. the county, yet, because of Missouri's automatic exemption for any woman who chose not to serve, they represented only 14.5% of the final venires. In *Taylor,* 53% of all persons eligible for jury service were women, but, due

to Louisiana's provision that no woman could serve on a jury unless she filed a written declaration of her willingness to do so, they constituted less than 1% of the persons chosen from the jury wheel for service. The discrepancies at issue here are not as great as those in *Duren* and *Taylor.*[16] Nor does our system have any exemptions, automatic or otherwise, that would necessarily single out Spanish–surnamed persons as to exclude a large segment of the population from jury service, as occurred in those cases.

We find that appellant did not present sufficient evidence to show that the underrepresentation of Spanish–surnamed persons was systematic. Consequently, the trial judge was correct in ruling that he had not made out a prima facie case.

## B. *The Equal Protection Challenge*

It has long been established that the equal protection component of the Fifth Amendment protects against the discriminatory exclusion or substantial underrepresentation of persons from grand and petit juries based on race, sex, national origin, and the like. *See, e. g., Castaneda v. Partida, supra; Alexander v. Louisiana, supra; Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532,

---

added). Because we find that appellant failed to carry his burden of showing systematic exclusion, we need not decide whether a group constituting 2% of the population of the District of Columbia is sufficiently numerous, and has ideas and attitudes so different that they cannot adequately be represented and protected by the rest of the community, so as to make it a "distinctive" group for purposes of the fair cross section requirement.

The trial judge did not rule on whether the representation of Spanish–surnamed persons on grand and petit jury venires was "fair and reasonable" in relation to their numbers in the community. *Duren v. Missouri, supra* at 364, 99 S.Ct. at 668. Consequently, we need not review appellant's showing on the second prong of the *Duren* test.

**15.** The exact language appellant relies on is:
Finally, in order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury–selection process. Petitioner's proof met this requirement. His undisputed demonstration that a

large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic–that is, inherent in the particular jury–selection process utilized. [439 U.S. at 366, 99 S.Ct. at 669.]

**16.** Appellant has urged us to use comparative disparity measures in analyzing the facts of his case and comparing them with previous Supreme Court cases (*e. g.,* comparative disparity measures for *Duren* and appellant are 50.5% and 77%, respectively). *But see United States v. Whitley,* 491 F.2d 1248, 1249 (8th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974) (comparative disparities tend to distort reality when applied to group that represents only small part of overall population). On the other hand, the government has urged us to use absolute disparity measures (*e. g.,* absolute disparities for *Duren, Taylor,* and appellant are 39.5%, 52%, and 1.54%, respectively). We choose not to rely on either method exclusively.

24 L.Ed.2d 567 (1970); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879). In *Castaneda,* the Supreme Court set forth the test for showing substantial underrepresentation that violates the Fifth Amendment: the defendant must show that (1) the underrepresented group is an identifiable, distinct class; (2) the group has been substantially underrepresented on juries in relation to its representation in the population; and (3) the jury system at question is susceptible of abuse or not racially neutral. 430 U.S. at 494, 97 S.Ct. at 1280. Although the test appears to be very similar to the fair cross section test just discussed, there is one critical difference: in an equal protection challenge, the defendant must present evidence of a discriminatory intent. *See Duren v. Missouri, supra* at 368 n.26, 99 S.Ct. at 670 n.26. However, once the defendant has made out a prima facie case, the government bears the burden of showing that "racially neutral selection criteria have produced" the unequal representation. *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976), quoted in *Castaneda v. Partida, supra* at 494, 97 S.Ct. at 1280.

■ Here, as in the fair cross section analysis, we do not decide whether appellant met the first two prongs of the test, for we find, as the trial judge did, that appellant's evidence did not fulfill the third requirement. Unlike previous Supreme Court cases relied on by appellant, there is no evidence here that our random selection process is not racially neutral or is susceptible of abuse. For example, the system invalidated in *Castaneda* was the highly subjective "key man" system in which the jury commissioners personally chose members of the community to be placed on the list from which juries were chosen.[17] 430 U.S. at 484, 97 S.Ct. at 1275. In *Whitus v. Georgia, supra,* the Supreme Court struck down a county system in which the jury commissioners personally chose those persons they thought qualified for jury service ("upright," "intelligent") from a list compiled from a segregated tax digest. *Id.* at 548–49, 87 S.Ct. at 645–646. *See also Turner v. Fouche, supra* at 348–51, 90 S.Ct. at 533–535 (names selected from list containing names of persons known to commissioners and thought to be "the very best people in the county"). In contrast, our jury lists are compiled from racially neutral sources and all exemptions, qualifications, and excuses are based solely on objective criteria. It was not enough for appellant to show statistics alone;[18] he had to produce sufficient evidence of an impermissible system to support an inference of intentional discrimination. *See United States v. Lopez,* 588 F.2d 450, 451–52 (5th Cir.), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 319, *reh. denied,* 444 U.S. 888, 100 S.Ct. 188, 62 L.Ed.2d 122 (1979); *United States v. Hanson,* 472 F.Supp. 1049 (D.Minn.1979); *State v. Avery,* 299 N.C. 126, 261 S.E.2d 803 (1980); *State v. Cornell,* 281 N.C. 20, 187 S.E.2d 768 (1972).

## C. *The Statutory Challenge*

The Federal Jury Selection and Service Act [the Act], *supra,* applicable to both the federal and local courts in the District of

---

**17.** Further qualifications, including one that the juror be "of sound mind and good moral character," were tested by the court. *Castaneda v. Partida, supra* at 485, 97 S.Ct. at 1275.

In the typical key man system, the jury commissioners contact "key men," generally those prominent in church and civic groups, to obtain names for potential jury service. *See* Daughtrey, *supra* note 13 at ----.

**18.** "[A]n official act is not unconstitutional *solely* because it has a racially disproportionate impact." *Castaneda v. Partida, supra* at 493, 97 S.Ct. at 1279 (citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–563, 50 L.Ed.2d 450 (1977) (emphasis in original)).

In none of the underrepresentation, as opposed to total exclusion, cases has the Supreme Court found a prima facie case based on statistics alone. *See* Daughtrey, *supra* note 13 at 17–18 n.68.

Columbia,[19] requires all district courts to establish plans for a jury selection system that does not discriminate against potential jurors on the basis of race, color, religion, sex, national origin, or economic status, and that utilizes source lists representing a fair cross section of the community.[20] All selection is to be done in a random manner, and the original source list must be drawn from either the voter registration list or the list of actual voters in the community. 28 U.S.C. § 1863(b)(2).[21] If a defendant believes that the selection system does not substantially comply with the policies of the Act, he may move to dismiss his indictment. *Id.* § 1867(a).

We find that appellant has failed to sustain his burden of showing a violation of the Act. Here, as in a challenge brought under the Fifth and Sixth Amendments, the defendant has the burden of showing that the underrepresentation of the class is due to the *systematic* exclusion of a cognizable group in the community (fair cross section challenge), or due to purposeful discrimination (equal protection challenge). *See United States v. Carter*, 568 F.2d 453, 455 (5th Cir. 1978); *United States v. Test*, 399 F.Supp. 683, 691 (D.Colo. 1975), *aff'd*, 550 F.2d 577 (10th Cir. 1976), and cases cited therein; *United States v. Guzman*, 468 F.2d 1245, 1247 (2d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973); *United States v. Par-*

*ker*, 428 F.2d 488, 489 (9th Cir.), *cert. denied*, 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150 (1970). For the reasons stated in sections A and B above, appellant has not shown that our selection system substantially fails to comply with sections 1861 and 1862.

The remainder of appellant's statutory challenge is somewhat unclear. Basically, he asserts that the District of Columbia Jury Commission has been derelict in its duty to insure that the goals of the Act are being met.

The purpose of the Act is "to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." H.R. Rep. No. 1076, 90th Cong., 2nd Sess. at 3, *reprinted in* [1968] U.S.Code Cong. & Ad. News, pp. 1792, 1792. To carry out this goal, Congress mandated two important requirements for each jury selection plan–absolute random selection and objective criteria for the determination of disqualifications, excuses, and exemptions.[22] *Id.* at 4, U.S.Code Cong. & Ad.News, *supra* at 1793. The focal point for deciding whether the system substantially complies with the requirements of the Act (*i. e.*, whether there is an affirmative duty to supplement the original source list), is not the actual jury that hears the case, nor necessarily the

**19.** The trial judge did not rule on appellant's statutory challenge because he did not believe the Act was applicable to the Superior Court. This belief was erroneous, however, because 28 U.S.C. § 1869(f) expressly makes both the fair cross section and antidiscrimination provisions applicable to the Superior Court. *See also Green v. United States*, D.C.App., 304 A.2d 286 (1973).

**20.** 28 U.S.C. §§ 1861, 1862, 1863.

**21.** Section 1863(b)(2) provides that the District of Columbia may obtain its original source list from the city directory rather than the voter lists. Consequently, until 1972, the source list for the District was compiled from the city directory. *See United States v. Diggs*, 173 U.S. App.D.C. 95, 522 F.2d 1310 (1975), *reh. denied sub nom. United States v. Floyd*, 175 U.S.App. D.C. 337, 535 F.2d 1299, *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *Unit-*

*ed States v. Greene*, 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974). In April of 1972, Congress amended the federal jury qualifications to allow for a minimum age of eighteen rather than twenty–one. Because the city directory did not adequately list residents under twenty–one, the plan was modified to provide that the source list would be compiled from the voter registration list. In 1976, the plan was modified again to provide for supplementation of the voter list with the motor vehicle registration list.

**22.** The legislation was enacted specifically to combat the dangers inherent in the "key man" system. *Taylor v. Louisiana, supra* at 529 n.8, 95 S.Ct. at 696. *See generally* note 17 and accompanying text, *supra*.

wheel from which juries are chosen.[23] Rather, it is the original source list from which names are selected for potential service. *See, e. g., United States v. Goff, supra* (analyzing system by comparing disparity between composition of voting age population and composition of voter registration list); *United States v. Ramos Colon,* 415 F.Supp. 459, 463 (D.P.R.1976), and cases cited therein. As stated in the legislative history:

If the voter lists are used and supplemented where necessary, and if the procedures outlined in the bill are otherwise rigorously followed it is no departure from the standards of the legislation that the qualified jury wheel, the venire or array, or the jury itself, may not reflect a community cross section. The act guarantees only that the jury shall be "selected at random from a fair cross section of the community." It does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup. Thus, no challenge lies on that basis. In short, the act attempts to achieve its cross sectional aim by insuring that the basic source list is adequate in that regard and that no procedure is employed that would impermissibly diminish the likelihood that a cross section will be attained. [H.R.Rep. No. 1076, *supra* at 5, U.S.Code Cong. & Ad.News, *supra* at 1794.]

■ Appellant has presented no evidence concerning the composition of the source list. Nor has he presented any evidence tending to show that, for example, Spanish–surnamed persons are in any way prohibited from having their names placed on voter registration lists. *See United States v. Guzman, supra* at 1248. Rather, he emphasizes only that Spanish–surnamed persons are underrepresented on post–sum-

mons venires (venires comprised of persons who are not disqualified by statute and who respond to the summons by actually appearing for service–a group several steps removed from the original source list). Given our totally random selection procedures and objective criteria for exclusion, we cannot find, on appellant's evidence, that the District of Columbia plan fails to comply substantially with the Act.

## II

Appellant also challenges two aspects of his trial on the criminal charges. His first argument concerns certain rebuttal evidence presented by the government. During cross–examination of appellant, the prosecutor asked him if he had ever been laid off from his job because he could not get along with his coworkers. Appellant responded that he had not. On rebuttal and over defense objection, the government impeached appellant's assertion with the testimony of his employer that he had laid appellant off because he was unable to get along with others. Appellant argues that this testimony was improper because it constituted extrinsic impeachment on a collateral issue.

■ We need not decide that precise question, however, for we find that the government was entitled to present the subject matter of the testimony as proper rebuttal of character evidence presented by appellant. During the presentation of his self–defense case, appellant offered evidence of the victim's bad character and testimony concerning his own good character. The government was then entitled to rebut the evidence of appellant's good character, either by cross–examining appellant's witnesses or presenting its own witnesses. *See Michelson v. United States,* 335 U.S.

---

23. The composition of the jury wheel is important in determining the *impact* the original source list has on the system, *i. e.*, in determining "substantiality" of compliance. *United States v. Goff,* 509 F.2d 825, 826 (5th Cir.), *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975). This is not to say that the original source list is the focal point for constitutional, as opposed to statutory, challenges. The Supreme Court has made it clear that in constitutional challenges, the system must not exclude distinctive groups from "jury wheels, pools of names, panels, or venires from which juries are drawn." *Taylor v. Louisiana, supra* at 538, 95 S.Ct. at 701, *quoted in Duren v. Missouri, supra* at 363–64, 99 S.Ct. at 668.

469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948); 1 Wharton's Criminal Evidence § 235 (13th ed. 1972). Consequently, the subject matter was a proper one for rebuttal and the trial judge did not err in allowing the prosecutor to present the witness.

We note, however, that neither appellant nor the government presented the character evidence in the proper form, i. e., whether the witness heard of appellant's reputation for good or bad character traits.[24] See Michelson v. United States, supra at 477, 69 S.Ct. at 219; United States v. Lewis, 157 U.S.App.D.C. 43, 482 F.2d 632 (1973); United States v. Bishton, 150 U.S. App.D.C. 51, 463 F.2d 887 (1972); 1 Wharton's Criminal Evidence, supra at §§ 230, 235. Consequently, there was error in the allowance of the testimony as presented, although not reversible error. Kotteakos v. United States, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

Appellant's final argument concerns the trial judge's denial of his motion for a mistrial after the prosecutor made reference in his closing argument to the fact that the death penalty is not given in the District of Columbia.[25] We agree with the trial judge that the prosecutor's remark was "improper," but we do not find that it warranted a mistrial or that it "rise[s] to the level of 'substantial prejudice'" justifying reversal. Dyson v. United States, D.C. App., 418 A.2d 127, 132 (1980) (quoting Dent v. United States, D.C.App., 404 A.2d 165, 172 (1979)); see Sellars v. United States, D.C.App., 401 A.2d 974, 978 (1979); Williams v. United States, D.C.App., 379 A.2d 698, 700 (1977).

Affirmed.

HARRIETT R. TAYLOR, Associate Judge, concurs in the result.

**24.** Nor did either party object to the form of the questions.

**25.** The prosecutor stated:

We submit that the evidence shows that this was a cold–blooded killing by the defendant of Bobby Williams; that Bobby Williams had in fact had a fight with the defendant that morning. Bobby Williams may have been wrong, may have been right. Usually when there's a fight, both sides are a little bit responsible. But you know we don't give the death penalty for murderers; so a fortiori we don't give the death penalty to people that give someone a little left; we don't give people that fight on the job, we don't give them the death penalty, to people that argue.