## The People of the State of New York, Respondent, v Guillermo Guzman, Appellant.

Second Department, September 27, 1982

**APPEARANCES OF COUNSEL**

*William E. Hellerstein* (*Charlene Terzian Hyler* and *Elaine T. Stogel* of counsel), for appellant.

*Elizabeth Holtzman, District Attorney* (*Holly L. Halper* and *Allan P. Root* of counsel), for respondent.

**OPINION OF THE COURT**

*Per Curiam.*

The paramount question on this appeal is whether defendant's indictment should be dismissed on the ground that alleged constitutional and statutory violations in the Kings County Grand Jury selection process caused an underrepresentation of Hispanics in the Grand Jury pool and in the Grand Jury that indicted him. In our view, the question must be answered in the negative, and the judgment of conviction must be affirmed.

## BACKGROUND

The defendant Guzman was indicted in August, 1979, for the following crimes: robbery in the first and second degrees, criminal possession of a weapon in the fourth degree, and criminal possession of stolen property in the third degree.

Thereafter the defendant, who is of Hispanic origin, moved to dismiss the indictment on the ground that, as a result of State action, Hispanics had been impermissibly excluded from the Grand Jury pool thereby violating his constitutional guarantee of equal protection of the law, pursuant to the holding of the Supreme Court of the United States in *Castaneda v Partida* (430 US 482). In addition, defendant also requested that the indictment be dismissed on the ground that the Grand Jury was not selected at random from a fair cross section of the community as required by section 500 of the Judiciary Law. Since these issues were similar to those raised in a pretrial motion made in *People v Best* (Kings County, Index No. 869/78 [see *People v Best*, 89 AD2d 1018 (decided herewith)]), pursuant to which a lengthy hearing had been held, it was agreed by both the People and defense counsel that the defendant would rely on the record adduced at the *Best* hearing.[1]

## THE HEARING

At the hearing conducted on Best's motion to dismiss the indictment against him, proof was introduced that Hispanics are considered as a distinct identifiable group by the United States Census Bureau and the Department of Labor. The validity of this classification was corroborated by the testimony of a professor of sociology that Hispanics share several characteristics as a group, e.g., a cultural background having its roots in Spain, Catholicism as the dominant religion and Spanish as a common language.

With regard to the question of whether Hispanics had been substantially underrepresented on the Grand Jury rosters over a significant period of time, the movant called a staff accountant employed by the District Attorney's office who prepared a study in connection with the claim of

---

1. Although the indictment against Guzman was filed in 1979, evidence adduced at the hearing in *Best* regarding the selection of the 1978 Grand Jury pool established that the list of names drawn in 1977 to determine who would serve in 1978 was good five years from that year on.

underrepresentation of Hispanics. In that study, it was demonstrated that while the 1970 census indicated that Hispanics comprised 14.5% of the Kings County population, only an average 3.5% of the persons on the Grand Jury rosters for the nine-year period of 1970 to 1978 had Hispanic surnames. According to the study, an absolute disparity of 11% existed, reflecting the difference between the percentage of the particular class in the population (14.5%) and the percentage of the particular class on Grand Jury rosters (3.5%). The disparity revealed by the study was also analyzed in terms of comparative disparity, which is defined as the actual disparity (11%) divided by the proportion of the class in the population (14.5%). This resulted in a comparative disparity of 76%, signifying that Hispanics are underrepresented by 76% in relation to their proportional representation in the population of the county.

An expert statistician and sociologist employed as a consultant for the Legal Aid Society testified that the probability that the disparity had occurred by chance in a random method of jury selection was less than 1 in 1,000.

In response to the evidence submitted by the defendant, the People called Anthony Durso, the county clerk and Commissioner of Jurors in Kings County, who is responsible for the drawing and impaneling of jurors. In 1968, when he became commissioner, Kings County had a population of 3,000,000 and there were only 65,000 names in the "Master [jury] pool". In an attempt to increase the pool, the commissioner, in 1975, began utilizing the Kings County licensed driver's list from the Commissioner of Motor Vehicles in addition to the board of elections list, which had been previously used (and which was supplemented by the January list of newly registered voters) so that by June, 1979, when the commissioner testified at the hearing, there were 340,000 names in the jury pool.

Magnetic tapes containing the names on the motor vehicle and board of election lists are run through a computer and a preselected number of names are randomly chosen.[2]

---

2. The staff accountant employed by the District Attorney conducted a study of these two potential juror source lists. Using the list of Hispanic surnames, he found that of the 305,908 names on the 1976 motor vehicle list, 39,345 (12.9%) were Hispanic. Of the 168,783 names on the board of elections "exam list, 1977", 24,705 (14.6%) were Hispanic.

The computer then prints the names and addresses of those selected on subpoenas to qualify, which are returned to the commissioner's office to be mechanically inserted into envelopes. Recipients of the subpoenas are summoned to appear on a definite date, about two weeks in the future, for an examination regarding their qualifications for jury service. To the extent possible, given available manpower, the commissioner attempts to find the correct address for those summonses which are returned marked "Wrong Address", and to send follow-up letters to those who did not respond to the summons. When the recipient of the subpoena appears, and it is ascertained that he or she currently resides in Kings County, he or she is given a questionnaire to fill out which is in conformity with section 513 of the Judiciary Law.[3] An oral examination is then conducted to determine, *inter alia,* the veracity of the responses.

Those persons whose answers indicate that they fail to qualify under section 510 of the Judiciary Law, or who are

---

3. "§513. Form of questionnaire

"The questionnaire to be filled out by prospective jurors shall contain substantially the following information and shall be in such form as the commissioner may prescribe.

"JUROR QUALIFICATION QUESTIONNAIRE

"1.  Name ........................................................................
"2.  Residence ................ ............Apt. No. ..........Zip Code ..........
"3.  Date of Birth ...................Place of Birth ....................
"4.  Sex ......Marital Status: Single ......Married ......Widowed ......
"5.  Extent of Education: Primary ......High School ......College ......
"6.  How long living at present address? ...............................
     In New York State? ................In this country? ................
"7.  Give any other last names you have ever used .......................
"8.  Occupation ................ .............Employed at present? ............
"9.  Business Address .................................................
"10. Home telephone number ........Business Telephone Number ........
"11. Spouse's Name ................Spouse's Occupation ................
"12. Spouse's Address ....................Spouse's telephone No. ..........
"13. Name and age of each child residing with you ......................
"14. Has your spouse or any other person caring for and supervising your child
     or children claimed an exemption from jury service for that reason? ....
     If answer is yes, give details ...............................
"15. Are you a citizen of the United States? ........If you are a naturalized
     citizen, when and where were you naturalized? ......................
"16. Did you register for the last general election? ......................
     Where did you live then? ........................................
"17. Have you ever been denied listing as a qualified juror or been stricken from
     any list of jurors? ...............................................
     Where and why? ................................................

*(n. cont'd)*

disqualified from serving pursuant to section 511 thereof, are rejected.[4] The questionnaires are then marked "Q" for qualified, or "Rej" for rejected, along with the reason

"18. Have you ever been convicted of a crime? ...........................
Where? ..............When? ..............What crime? ..............
Have any judgments been entered against you in a civil court on allegations of fraud or misconduct? ...........................................
If answer is yes, give details ........................·...................

"19. Do you have any physical or other infirmity impairing your ability to serve as a juror? ...........................................
If the answer is yes, please specify .....................................

"20. If there is a certain month during which you wish to serve, enter it in this space ...........................................
Please give reason ........................................

"21. If there is a certain month during which you do not wish to serve, enter it in this space ...........................................
Please give reason ........................................

"22. Have you ever filled out a juror qualification questionnaire in this County? ...........................................

"23. Have you ever served as a juror or grand juror? ......................
Where and when? ........................................

"I ...................... certify: I am not a resident of ..........county, but I reside at ................ City of .... .... County of .... ....State of .... and have resided there since ................ I certify: I am entitled to and claim exemption because ................ ...................... I am disqualified from service for the following reason ................ ...................... ...................... ...................... | Explanation of any answers on this form, or remarks, may be made here: .

The foregoing answers are true in all respects.

Signature ...............".

4. Sections 510 and 511 of the Judiciary Law provide as follows:

"§ 510. Qualifications

"In order to qualify as a juror a person must:

"1. Be a citizen of the United States, and a resident of the county.

"2. Be less than seventy-six and not less than eighteen years of age.

"3. Be in possession of his natural faculties and not incapable, by reason of mental or physical infirmity, or rendering satisfactory jury service.

"4. Not have been convicted of a felony.

"5. Be intelligent, of good character, able to read and write the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification questionnaire, and be able to speak the English language in an understandable manner."

"§ 511. Disqualifications

"Each of the following persons is disqualified from serving as a juror:

"1. Members in active service in the armed forces of the United States;

"2. Elected federal, state, city, county, town or village officers;

therefor, the date and the examiner's initials. Those who claim to be eligible for exemptions pursuant to section 512 of the Judiciary Law must see the commissioner who determines the validity of these claims.[5]

Those individuals found qualified to be grand jurors are then fingerprinted, pursuant to section 514 of the Judiciary Law, and become members of the general pool (see 22 NYCRR 620.6). Prospective jurors are instructed to leave both the race and skin tone spaces on the fingerprint card blank; in the event they are completed, the answers are marked out, or the card destroyed and the prospective juror is required to complete a new one. This particular card is

"3.  The head of a civil department of the federal, state, city, county, town or village government, members of a public authority or state commission or board, and the secretary to the governor;

"4.  A federal judge or magistrate or a judge of the unified court system.

"5.  A person who has served on a grand or petit jury within the state, including in a federal court, within two years of the date of his next proposed service. This sub division shall not be construed to disqualify a juror from serving on more than one grand or petit jury during a term of jury service for which he has been called."

5.  Section 512 of the Judiciary Law provides:

"§ 512. Exemptions

"Each of the following persons is exempt from service as a juror upon claiming exemption therefrom:

"1.  A member of the clergy or Christian Science practitioner officiating as such and not following any other calling;

"2.  A licensed physician, dentist, pharmacist, optometrist, psychologist, podiatrist, registered nurse, practical nurse, embalmer or a Christian Science nurse exempt from licensing by subdivision g of section sixty-nine hundred eight of the education law, regularly engaged in the practice of his profession;

"3.  An attorney regularly engaged in the practice of law as a means of livelihood;

"4.  A police officer as defined in section 1.20 of the criminal procedure law, or an official or correction officer of any state correctional facility or of any penal correctional institution who is defined as a peace officer in subdivision twenty-five of section 2.10 of the criminal procedure law, or a member of a fire company or department duly organized according to the laws of the state or any political subdivision thereof and performing duties therein; or an exempt volunteer fireman, as defined in section two hundred of the general municipal law;

"5.  A sole proprietor or principal manager of a business, firm, association or corporation employing fewer than three persons, not including such proprietor or manager, who is actually engaged full-time in the operation of such business as a means of livelihood;

"6.  A person seventy years of age or older;

"7.  A parent, guardian or other person who resides in the same household with a child or children under sixteen years of age, and whose principal responsibility is to actually and personally engage in the daily care and supervision of such child or children during a majority of the hours between eight a.m. and six p.m., excluding any period of time during which such child or children attends school for regular instruction.

"8.  A person who is a prosthetist or an orthotist by profession or vocation."

provided by the Bureau of Criminal Justice and the commissioner is mandated to use it since it is the only one which the Division of Criminal Justice Services in Albany will process.

After the fingerprinting process is completed, the names of the qualified prospective jurors are added to the names already in the master jury pool. Each October, 7,500 names are drawn randomly from the master pool to determine those to be chosen to serve as grand jurors in the following year. These names are then placed in a small drum which is sealed. To meet the average monthly need of 92 grand jurors, the commissioner selects 350 names at random each month and summons those people to appear. About one half of those called appear, but this is more than necessary to fill the panels.

In addition to this general overview of the Grand Jury selection process, the commissioner gave a detailed statistical analysis of the initial phase of the process, i.e., the completion of the qualification questionnaire. The commissioner testified that in November, 1978, a month chosen at random but nonetheless representative of an average month, his office mailed out 7,300 subpoenas requiring people to appear for juror qualification examination. Using a list of Hispanic surnames, the commissioner determined that 1,231 of the 7,300 notices, or 16.9%, were sent to Hispanics. Of the 1,231 Hispanic recipients of the subpoenas, 294, or 24%, appeared for the qualification examination and 132 of those who appeared, or 45%, qualified. The commissioner testified that of the 162 who failed to qualify, the majority failed to do so because of their inability to read, write and comprehend the English language. Specifically, about 90 of the 162 were rejected because they were unable to complete the questionnaire, one was disqualified for having a felony conviction, one was exempted as the sole proprietor of a business, and the remainder, approximately 70, were most if not all women, exempt upon their request because they had the responsibility of caring for young children.

In contrast, of the 6,069 non-Hispanic recipients of the subpoenas, 3,154 or 52% appeared for the qualification

examination and 1,884, or 60% of those appearing, qualified.

In sum, the commissioner's study demonstrated that 31% of non-Hispanics summoned, qualified (1,884 out of 6,069 summoned) and were added to the jury pool, whereas 11% of the Hispanics summoned, qualified (132 out of 1,231 summoned) and were added to the jury pool. Of the total population found qualified and added to the pool, 6.5% were Hispanic (132 out of 2,016).

## DECISION OF CRIMINAL TERM

Based upon the evidence adduced at the hearing, Criminal Term (in *People v Best, supra*) found that defendant had prevailed in meeting the first two prongs of the three-pronged test set forth in *Castaneda v Partida* (430 US 482, 494, *supra*), i.e., that Hispanics constituted a "recognizable, distinct class" and that "the procedure employed resulted in substantial underrepresentation" of Hispanics on the Kings County Grand Jury rosters.

However, Criminal Term held that the movant had failed to establish that the Kings County Grand Jury selection system was susceptible to abuse or not racially neutral as required under *Castaneda* (*supra*). It therefore denied the motion to dismiss the indictment.

On Guzman's appeal from his ensuing judgment of conviction, he argues, *inter alia,* that Criminal Term erred in denying his motion to dismiss. We affirm.

## THE EQUAL PROTECTION CHALLENGE

Defendant contends that the evidence adduced at the *Best* hearing made a prima facie showing that the Kings County Grand Jury selection system resulted in the purposeful substantial underrepresentation of Hispanic-surnamed individuals in the Grand Jury pool and in the Grand Jury that indicted him, in violation of constitutional equal protection guarantees (*Castaneda v Partida, supra*).

In *Castaneda* (*supra,* pp 494-495, 497-498), the Supreme Court delineated the following elements which a defendant must establish to make out a prima facie case of discrimination in Grand Jury selection in violation of his right to equal protection: "The first step is to establish that the

group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied * * * Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time * * * Finally * * * a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing * * * Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case * * * [and] dispel the inference of intentional discrimination."

(a) *Distinct Class for Equal Protection Purposes [Identifiable Group]*.

With respect to the first part of the prima facie test, we conclude that Hispanic[6] persons constitute a recognizable, distinct class for the purpose of an equal protection challenge. Whether such an identifiable group exists within a community is a question of fact (*Hernandez v Texas,* 347 US 475). Predicated upon the sociology professor's testimony that Hispanics are identifiable as a cognizable social group in view of their common language of Spanish, their common religion of Catholicism, and their common cultural heritage, and other testimony that Puerto Ricans, who constitute a large portion of the Hispanic population, were underprivileged and economically disadvantaged, Criminal Term properly concluded that Hispanics constitute a single cognizable group recognizable as a distinct class often singled out for different treatment under the laws (cf. *Keyes v School Dist. No. 1,* 413 US 189, 197).

(b) *Substantial Underrepresentation*.

The level of underrepresentation of qualified members of distinct classes is determined "by comparing the propor-

---

6. As Criminal Term noted, defendant used two different definitions of the term "Hispanic"; the first being derived from the 1970 census which demonstrated that 14.5% of the persons in Kings County were of "Spanish origin or descent" and the second being derived from the list of Spanish surnamed persons compiled by the United States Department of Labor. These methods may be considered equivalent for the purposes of this case (cf. *Castaneda v Partida,* 430 US 482, 486, n 5).

tion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time" (*Castaneda v Partida,* 430 US 482, 494, *supra*).

The statistics presented by defendant in support of disparity are suspect to some extent in that the percentage of Hispanics in the total population was used as opposed to eligible Hispanics in the total population (see *Castaneda v Partida, supra,* p 504, BURGER, Ch. J., dissenting: "The decisions of this Court suggest, and common sense demands, that *eligible* population statistics, not gross population figures, provide the relevant starting point") and this figure was in turn compared, not with the proportion of Hispanics called to serve, but with the proportion of such persons actually on the Grand Jury rosters. Only the study of the two source lists (the 1977 board of elections "exam list" and the 1976 motor vehicle list, reflecting 14.6% and 12.9% Hispanic representation, respectively) relate to the number of persons available to serve, and only the commissioner's survey of summonses to qualify mailed in November, 1978 reflects the percentage of summonses mailed to Hispanics (16.9%), that is those "called to serve" (*Castaneda v Partida, supra,* p 494).

No evidence was presented tending to show that Hispanics are prohibited from having their names placed on the source lists; rather, defendant contends that Hispanics are underrepresented in postsummons venires (rosters comprised of persons who respond to a summons by actually appearing and who are not disqualified or exempted by statute). In *Castaneda* (*supra,* p 484) the discrimination complained of stemmed from the operation of a "'key man'" Grand Jury selection system, in which jury commissioners personally selected prospective grand jurors from members of the community at large. Underrepresentation was established by demonstrating a disparity between the proportion of the group in the total population with those on the list from which grand jurors were summoned. In the instant case, however, it is alleged that discrimination occurs during the qualification process. Therefore we deem it appropriate to use, for comparison

purposes, the general population statistics and the statistics reflecting Hispanic surnamed individuals actually on the Grand Jury roster.

Figures from the 1970 census data demonstrated that 14.5% of the general population in Kings County were Hispanic. It is assumed for the purpose of this appeal that this figure remained constant (see *Castaneda v Partida,* 430 US 482, 495, n 15, *supra*). There is no evidence in the record to suggest that the 1970 census data significantly distorted the applicable percentages (cf. *Duren v Missouri,* 439 US 357, 365). The study of the staff accountant employed by the District Attorney indicates that over the nine-year period of 1970-1978, an average of 3.5% of those individuals on the Grand Jury rosters had Hispanic surnames.

Under the absolute disparity calculation, the percentage of Hispanics on the rosters is subtracted from the percentage in the general population, resulting in a figure constituting the absolute difference. Here the absolute disparity calculation showed an 11% underrepresentation (14.5% minus 3.5%) (see, e.g., *United States v Clifford,* 640 F2d 150, 155). The resulting comparative disparity is 76%.[7] This figure reflects underrepresentation as the percentage by which the probability of being in the Grand Jury pool is reduced for Hispanics residing in Kings County.[8] In addition, the statistician and sociologist for the Legal Aid Society opined that the probability that the disparity had occurred by chance in a random method of jury selection

---

7. The comparative disparity is equal to the actual disparity divided by the proportion of Hispanics in the population, and may be calculated as follows (*United States v Clifford,* 640 F2d 150, 155, n 3):

$$\frac{\text{Proportion of the population that is in the specified category} - \text{Proportion of the source that is in the specified category}}{\text{Proportion of the population that is in the specified category}} \times 100$$

8. While comparative disparity and absolute disparity as bases for establishing underrepresentation have been questioned as producing distorted results (see *Foster v Sparks,* 506 F2d 805, 834-835), in view of the calculations by defendant's expert as to standard deviation and probability, we find it appropriate to use comparative disparity as a measure.

was less than 1 in 1,000. This court therefore finds that the deviations at bar are large enough to establish the requisite substantial underrepresentation of Hispanics in the Grand Jury pool.

(c) *Susceptibility to Abuse and People's Rebuttal.*

We now turn to the question of whether the selection procedure under consideration is "susceptible of abuse or is not racially neutral" (see *Castaneda v Partida,* 430 US 482, 494, *supra;* cf. *Rose v Mitchell,* 443 US 545, 566) and therefore supports the presumption of discrimination raised by the statistical showing.

The rationale for the third requirement — that it be demonstrated that the disparity is the probable result of intentional discriminatory practices — and its application have been discussed thusly: "This third requirement is necessary because equal protection principles do not protect against all disparities in representation, but only against those that result from arbitrary and discriminatory exclusions of persons because of race or other impermissible class-based characteristics. *See, e.g., Alexander v. Louisiana,* 405 U.S. 625, 630-31 * * * Thus, it must be shown that at some point in the selection process there was an opportunity for abuse. This typically has occurred when the so-called 'key man' system is utilized — where a jury commission selects persons from the community known to be upstanding citizens. Under such a system, where a subjective decision is made as to a person's qualifications to sit on a jury, the potential for discrimination often is present. *See, e.g., Castaneda v. Partida,* 430 U.S. 482" (*United States v Hanson,* 472 F Supp 1049, 1055, affd 618 F2d 1261). Although the law is somewhat unclear as to whether susceptibility of the selection system under examination to abuse is an element of a prima facie case of discriminatory purpose (compare *Rose v Mitchell,* 443 US 545, 565, *supra; United States v Hanson,* 472 F Supp 1049, 1055, *supra;* and *United States v Lopez,* 588 F2d 450, 451-452, cert den 442 US 947, reh den 444 US 888; with *Castaneda v Partida, supra,* pp 495-496 and dissent therein of POWELL, J., at p 508; *Berry v Cooper,* 577 F2d 322, 327;

*United States v Brady,* 579 F2d 1121, 1133, cert den 439 US 1074; and *United States v Rodriguez,* 588 F2d 1003, 1007), some evidence was adduced as to certain nonrandom subjective factors which are injected into the selection system between the time a prospective juror is summoned and the time such a person becomes part of the pool. We will therefore assume for the purposes of this appeal that the system under examination is susceptible of abuse and that defendant met his initial burden. It is our view that the People adequately rebutted the presumption of constitutional discrimination.

Defendant maintains that the Kings County Grand Jury selection system afforded the opportunity for abuse and resulted in purposeful discrimination. He alleges that "although [the commissioner] is fully aware that month after month, year after year, a greater percentage of Hispanics than non-Hispanics fail to respond to the summonses for jury duty [yet], he continues to grant unauthorized exemptions to people who ignore the summonses, deliberately perpetuating a system whereby Hispanics are underrepresented on the grand jury panels."

Preliminarily, it should be noted that rebuttal testimony which merely denies discriminatory intent, while not inappropriate, has been found insufficient (see *Castaneda v Partida, supra,* p 498, n 19). However, rebuttal evidence which includes testimony by officials regarding the procedures followed is appropriate. In this regard it is clear that prior to the survey conducted in November, 1978, the commissioner was not aware that Hispanics responded to qualifying summonses at a lesser rate (24%) than non-Hispanics (52%).

Moreover, the commissioner could not be charged with discriminatory intent in that he granted "unauthorized exemptions" where summonses to qualify were mailed in accordance with a race-blind random procedure, follow-up notices were sent and there is an absence of any contention upon defendant's part that other procedural requirements were not followed.

Additionally, the difference in the lower qualification rate of Hispanics (45%, as against 60% for non-Hispanics)

is not indicative of discriminatory purpose or practice. Rather, as the commissioner testified, this result is attributable in major part to English literacy deficiencies and, additionally, to the duty owed by certain of those Hispanics summoned to care for their young children (see Judiciary Law, § 512, subd 7). We therefore conclude that the evidence presented by the People adequately rebutted the prima facie case.

### FAIR CROSS SECTION CHALLENGE

The defendant maintains that the substantial underrepresentation of Hispanics in the Grand Jury pool constituted an infringement of his statutory right to be indicted by a Grand Jury drawn from a source fairly representative of the community. He bases his claim upon the fair cross section requirement embodied in section 500 of the Judiciary Law, which provides: "§ 500. Declaration of policy. It is the policy of this state that all litigants in the courts of this state entitled to trial by jury shall have the right to grand * * * juries selected at random from a fair cross-section of the community".

It is defendant's position that the standards set forth in *Taylor v Louisiana* (419 US 522) and *Duren v Missouri* (439 US 357, *supra)* relating to the constitutional right of a defendant to a petit jury drawn from a source fairly representative of the community, are applicable to the statutory right regarding Grand Juries contained in section 500 of the Judiciary Law.

Although we note, and defendant concedes, that Sixth Amendment requirements do not apply to challenges to the composition of State Grand Juries, in that indictment by such a body is not mandated under the Fourteenth Amendment as a condition precedent to a State criminal trial (see *Commonwealth v Bastarache,* __ Mass __, __, 414 NE2d 984, 987-988), for the purpose of this appeal, we assume, but do not decide, that the *standards* set forth in *Taylor* and *Duren* apply to defendant's statutory fair cross-section claim.

The test to determine whether a Sixth Amendment claim that a petit jury was not "drawn from a source fairly

representative of the community" (*Taylor v Louisiana*, 419 US 522, 538, *supra*) is found in *Duren v Missouri* (439 US 357, 364, *supra*). In that case the court, in discussing the nature of the fair cross-section inquiry enunciated in *Taylor*, stated (*supra*, p 364): "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

Once a challenger has established a prima facie case, the burden shifts to the State to demonstrate that "attainment of a fair cross section [is] incompatible with a significant state interest" (*supra*, at p 368), because "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group"[9] (*supra*, at pp 367-368).

It has long been the policy of our State that a criminal defendant is entitled to a petit jury drawn from a jury pool which is reasonably representative of a cross section of the community (see, e.g., *People v Parks*, 41 NY2d 36, 42). Discussing the fair cross-section requirements of the Sixth and Fourteenth Amendments, the Court of Appeals in *Parks* (*supra*, pp 42-43), wrote:

"While a criminal defendant in the State courts has a constitutional right, by virtue of the Sixth and Fourteenth Amendments to the Federal Constitution, to be tried by a jury that is truly representative of the community (*Peters v Kiff*, 407 US 493, 500; *Duncan v Louisiana*, 391 US 145),

---

**9.** Standards under fair cross-section requirements and the equal protection clause differ somewhat in that fair cross-section "distinctiveness" encompasses the broader principle that juries should be drawn from a source fairly representative of the community, whereas equal protection focuses upon classes which have historically been discriminatorily excluded or substantially underrepresented based upon race or national origin, etc. (see *Commonwealth v Bastarache*, __ Mass __, __, 414 NE2d 984, 992; compare *Taylor v Louisiana*, 419 US 522, with *Castaneda v Partida*, 430 US 482, and *San Antonio School Dist. v Rodriguez*, 411 US 1, 28).

the States have a wide discretion in formulating procedures for the selection of juries, provided that the source from which juries are derived 'reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.' (*Taylor v Louisiana,* 419 US, at p 528; *Brown v Allen* 344 US 443, 474.) Our democratic heritage, as well as the need for confidence in the fairness of the criminal justice system, requires that all segments of the community participate in the administration of justice. Hence, the deliberate exclusion of a particular community group or class of persons from jury service violates the constitutional right to a jury trial. (*Taylor v Louisiana,* 419 US 522, 530, *supra.*)

"On the other hand, it is equally well established that defendants are not entitled to a jury of any particular composition. (*Taylor v Louisiana,* 419 US 522, 528, *supra; Fay v New York,* 332 US 261, 284.) Thus, the standard by which a claim of an illegally constituted jury is to be measured is whether the complainant has submitted proof sufficient to establish the existence of intentional and systematic discrimination in the jury selection process. (*People v Chestnut,* 26 NY2d 481, 488; *People v Horton,* 18 NY2d 355, 359-360, cert den 387 US 934; *People v Agron,* 10 NY2d 130, 141, cert den 368 US 922.) This test is mandated by the Federal Constitution (see *Peters v Kiff,* 407 US 493, 502-503, *supra; Carter v Jury Comm.,* 396 US 320, 330) and has been applied consistently in the courts of this State, in the Federal courts (see, e.g., *Cobbs v Robinson,* 528 F2d 1331, 1334-1335), as well as by our sister States (see, e.g., *Commonwealth v Martin,* 465 Pa 134, cert den 428 US 923; *State v Greeley,* 115 NH 461; *Roth v State,* 218 Kan 413.)"

We are of the view that these principles are equally applicable to the selection of grand jurors, since such individuals are drawn from the same pool as petit jurors (see Judiciary Law, § 514), and the same policy principles govern both (see Judiciary Law, § 500).

Assuming that defendant has met the first two prongs of the *Duren* test, it becomes clear that he has failed to

establish that the underrepresentation of Hispanics in the Grand Jury pool was due to the systematic exclusion of that group of individuals.

To establish a prima facie case for fair cross-section purposes, defendant is required to demonstrate more than statistical disparity; he has to show that the underepresentation was due to systematic exclusion of the group. Under the system in *Taylor v Louisiana* (419 US 522, *supra*), 53% of all persons eligible for jury service in the area concerned were female. However, a woman could not serve on a jury unless she filed a written declaration of her desire to serve and thus women represented less than 1% of those chosen from the "jury wheel". In *Duren v Missouri* (439 US 357, *supra*), the court held that a State system which provided an automatic exemption from jury service for women requesting not to serve violated fair cross-section requirements and amounted to systematic exclusion where 54% of the total adults in the community were women and jury venires averaged less than 15% female. The afore-mentioned situations differ considerably from that at bar.

It will be recalled that the commissioner's study of summonses to qualify, mailed by his office in November of 1978, demonstrated that persons with Hispanic surnames both responded and qualified at rates below those for non-Hispanics, i.e., 52% of non-Hispanics summoned appeared and 60% of those qualified; whereas 24% of Hispanics summoned appeared, and 45% of those qualified.[10]

It is defendant's position that because a far greater percentage of Hispanics than non-Hispanics failed to respond to the summonses to qualify, and because the commissioner took no further follow-up steps to remedy this situation, despite his power under subdivision (d) of section 502 of the Judiciary Law,[11] he in effect granted unauthor-

---

**10.** As the People correctly note, defendant's claim as it related to the response rate is based on a study of one month's response figures, and while the commissioner was of the opinion that the month studied represented a normal month, the claims in *Taylor* and *Duren,* wherein systematic exclusion was established, were based on statistics collected from much longer studies. For the purposes of this particular case, we will assume, without deciding, that further studies of other months would generate similar response rates.

**11.** Subdivision (d) of section 502 of the Judiciary Law provides: "The commissioner shall take any steps necessary to enforce the laws and rules relating to the drawing, selection, summoning and impanelling of jurors."

ized exemptions to those who wished to avoid jury duty, and systematically excluded a far greater percentage of Hispanics from the potential Grand Jury pool. The People disagree, maintaining, *inter alia,* that Hispanics have not been singled out for "special treatment" as women in *Taylor* and *Duren (supra)* were, and that the lower response rate to summonses to qualify is not attributable to any facet of the selection system. We agree. The Federal courts have consistently rejected claims of systematic exclusion where certain groups in a community respond in lesser numbers than other groups (see, e.g., *United States v Hanson,* 472 F Supp 1049, 1052, affd 618 F2d 1261, *supra; United States v Guzman,* 468 F2d 1245, 1247-1248, cert den 410 US 937; *United States v Clifford,* 640 F2d 150, 156, *supra).*

To constitute a showing of systematic exclusion, the underrepresentation complained of must be caused by something "inherent in the particular jury-selection process utilized" (*Duren v Missouri,* 439 US 357, 366, *supra).* In addition to statistical underrepresentation, it must be demonstrated "*when* in the selection process and *why* the exclusion occurred" (*Obregon v United States,* 423 A2d 200, 206 [DC App], citing *Duren;* emphasis in original). We conclude that defendant's claim is distinguishable from the claims in *Taylor* and *Duren* because the State has not singled out Hispanics and granted them exemptions while denying similar exemptions to other members of the community. The fact that Hispanics do not respond to summonses to qualify in proportion to their representation within the community cannot be viewed as an inherent defect in the selection process sufficient to constitute a showing of systematic exclusion. Additionally, we cannot accept defendant's proposal that affirmative action, in the form of, *inter alia,* sending out "summonses to additional numbers of Hispanics" should be undertaken in an attempt to secure a greater response from the Hispanic members of the community. Such a remedy would serve to abrogate this State's interest in a random, race-blind selection process (cf. *People v Thompson,* 79 AD2d 87, 104-105).

For the reasons stated above, defendant's motion to dismiss his indictment was properly denied.

We have considered the other contentions raised by defendant and find them to be without merit.

MOLLEN, P. J., TITONE, MANGANO and GIBBONS, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered March 27, 1980, affirmed.