# HERNANDEZ *v.* TEXAS.

No. 406.   Argued January 11, 1954.—Decided May 3, 1954.

*Carlos C. Cadena* and *Gus C. Garcia* argued the cause for petitioner. With them on the brief were *Maury Maverick, Sr.* and *John J. Herrera.*

*Horace Wimberly,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *John Ben Shepperd,* Attorney General, and *Rudy G. Rice, Milton Richardson* and *Wayne L. Hartman,* Assistant Attorneys General, for respondent.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The petitioner, Pete Hernandez, was indicted for the murder of one Joe Espinosa by a grand jury in Jackson County, Texas. He was convicted and sentenced to life imprisonment. The Texas Court of Criminal Appeals affirmed the judgment of the trial court. —— Tex. Cr. R. ——, 251 S. W. 2d 531. Prior to the trial, the petitioner, by his counsel, offered timely motions to quash the indictment and the jury panel. He alleged that persons of Mexican descent were systematically excluded from service as jury commissioners,[1] grand jurors, and petit jurors, although there were such persons fully

---

[1] Texas law provides that at each term of court, the judge shall appoint three to five jury commissioners. The judge instructs these commissioners as to their duties. After taking an oath that they will not knowingly select a grand juror they believe unfit or unqualified, the commissioners retire to a room in the courthouse where they select from the county assessment roll the names of 16 grand jurors from different parts of the county. These names are placed in a sealed envelope and delivered to the clerk. Thirty days before court meets, the clerk delivers a copy of the list to the sheriff who summons the jurors. Vernon's Tex. Code Crim. Proc., 1948, Arts. 333–350.

The general jury panel is also selected by the jury commission. Vernon's Tex. Rev. Civ. Stat., 1948, Art. 2107. In capital cases, a special venire may be selected from the list furnished by the commissioners. Vernon's Tex. Code Crim. Proc., 1948, Art. 592.

qualified to serve residing in Jackson County. The petitioner asserted that exclusion of this class deprived him, as a member of the class, of the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution. After a hearing, the trial court denied the motions. At the trial, the motions were renewed, further evidence taken, and the motions again denied. An allegation that the trial court erred in denying the motions was the sole basis of petitioner's appeal. In affirming the judgment of the trial court, the Texas Court of Criminal Appeals considered and passed upon the substantial federal question raised by the petitioner. We granted a writ of certiorari to review that decision. 346 U. S. 811.

In numerous decisions, this Court has held that it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury, or before a petit jury, from which all persons of his race or color have, solely because of that race or color, been excluded by the State, whether acting through its legislature, its courts, or its executive or administrative officers.[2] Although the Court has had little occasion to rule on the question directly, it has been recognized since *Strauder* v. *West Virginia,* 100 U. S. 303, that the exclusion of a class of persons from jury service on grounds other than race or color may also deprive a defendant who is a member of that class of the constitutional guarantee of equal protection of the laws.[3] The State of Texas would have us hold that there are only two classes—white and Negro—within the contemplation of the Fourteenth Amendment. The decisions of this Court

---

[2] See *Carter* v. *Texas,* 177 U. S. 442, 447.

[3] "Nor if a law should be passed excluding all naturalized Celtic Irishmen [from jury service], would there be any doubt of its inconsistency with the spirit of the amendment." 100 U. S., at 308. Cf. *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89, 92.

do not support that view.[4]   And, except where the question presented involves the exclusion of persons of Mexican descent from juries,[5] Texas courts have taken a broader view of the scope of the equal protection clause.[6]

Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws.   But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection.   Whether such a group exists within a community is a question of fact.   When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.   The Fourteenth Amendment is not directed solely against discrimination due to a "two-class theory"—that is, based upon differences between "white" and Negro.

As the petitioner acknowledges, the Texas system of selecting grand and petit jurors by the use of jury commissions is fair on its face and capable of being utilized

---

[4] See *Truax* v. *Raich,* 239 U. S. 33; *Takahashi* v. *Fish & Game Commission,* 334 U. S. 410.   Cf. *Hirabayashi* v. *United States,* 320 U. S. 81, 100: "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."

[5] *Sanchez* v. *State,* 147 Tex. Cr. R. 436, 181 S. W. 2d 87; *Salazar* v. *State,* 149 Tex. Cr. R. 260, 193 S. W. 2d 211; *Sanchez* v. *State,* 243 S. W. 2d 700.

[6] In *Juarez* v. *State,* 102 Tex. Cr. R. 297, 277 S. W. 1091, the Texas court held that the systematic exclusion of Roman Catholics from juries was barred by the Fourteenth Amendment.   In *Clifton* v. *Puente,* 218 S. W. 2d 272, the Texas court ruled that restrictive covenants prohibiting the sale of land to persons of Mexican descent were unenforceable.

without discrimination.[7]   But as this Court has held, the system is susceptible to abuse and can be employed in a discriminatory manner.[8]   The exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment.   The Texas statute makes no such discrimination, but the petitioner alleges that those administering the law do.

The petitioner's initial burden in substantiating his charge of group discrimination was to prove that persons of Mexican descent constitute a separate class in Jackson County, distinct from "whites."[9]   One method by which this may be demonstrated is by showing the attitude of the community.   Here the testimony of responsible officials and citizens contained the admission that residents of the community distinguished between "white" and "Mexican."   The participation of persons of Mexican descent in business and community groups was shown to be slight.   Until very recent times, children of Mexican descent were required to attend a segregated school for the first four grades.[10]   At least one restaurant in town prominently displayed a sign announcing "No Mexicans Served."   On the courthouse grounds at the time of the

---

[7] *Smith* v. *Texas,* 311 U. S. 128, 130.

[8] *Smith* v. *Texas, supra,* note 7; *Hill* v. *Texas,* 316 U. S. 400; *Cassell* v. *Texas,* 339 U. S. 282; *Ross* v. *Texas,* 341 U. S. 918.

[9] We do not have before us the question whether or not the Court might take judicial notice that persons of Mexican descent are there considered as a separate class.   See Marden, Minorities in American Society; McDonagh & Richards, Ethnic Relations in the United States.

[10] The reason given by the school superintendent for this segregation was that these children needed special help in learning English. In this special school, however, each teacher taught two grades, while in the regular school each taught only one in most instances.   Most of the children of Mexican descent left school by the fifth or sixth grade.

hearing, there were two men's toilets, one unmarked, and the other marked "Colored Men" and "Hombres Aqui" ("Men Here"). No substantial evidence was offered to rebut the logical inference to be drawn from these facts, and it must be concluded that petitioner succeeded in his proof.

Having established the existence of a class, petitioner was then charged with the burden of proving discrimination. To do so, he relied on the pattern of proof established by *Norris* v. *Alabama,* 294 U. S. 587. In that case, proof that Negroes constituted a substantial segment of the population of the jurisdiction, that some Negroes were qualified to serve as jurors, and that none had been called for jury service over an extended period of time, was held to constitute prima facie proof of the systematic exclusion of Negroes from jury service. This holding, sometimes called the "rule of exclusion," has been applied in other cases,[11] and it is available in supplying proof of discrimination against any delineated class.

The petitioner established that 14% of the population of Jackson County were persons with Mexican or Latin-American surnames, and that 11% of the males over 21 bore such names.[12] The County Tax Assessor testified

---

[11] See note 8, *supra.*

[12] The 1950 census report shows that of the 12,916 residents of Jackson County, 1,865, or about 14%, had Mexican or Latin-American surnames. U. S. Census of Population, 1950, Vol. II, pt. 43, p. 180; *id.,* Vol. IV, pt. 3, c. C, p. 45. Of these 1,865, 1,738 were native-born American citizens and 65 were naturalized citizens. *Id.,* Vol. IV, pt. 3, c. C, p. 45. Of the 3,754 males over 21 years of age in the County, 408, or about 11%, had Spanish surnames. *Id.,* Vol. II, pt. 43, p. 180; *id.,* Vol. IV, pt. 3, c. C, p. 67. The State challenges any reliance on names as showing the descent of persons in the County. However, just as persons of a different race are distinguished by color, these Spanish names provide ready identification of the members of this class. In selecting jurors, the jury commissioners work from a list of names.

that 6 or 7 percent of the freeholders on the tax rolls of the County were persons of Mexican descent. The State of Texas stipulated that "for the last twenty-five years there is no record of any person with a Mexican or Latin American name having served on a jury commission, grand jury or petit jury in Jackson County." [13] The parties also stipulated that "there are some male persons of Mexican or Latin American descent in Jackson County who, by virtue of being citizens, householders, or freeholders, and having all other legal prerequisites to jury service, are eligible to serve as members of a jury commission, grand jury and/or petit jury." [14]

The petitioner met the burden of proof imposed in *Norris* v. *Alabama, supra.* To rebut the strong prima facie case of the denial of the equal protection of the laws guaranteed by the Constitution thus established, the State offered the testimony of five jury commissioners that they had not discriminated against persons of Mexican or Latin-American descent in selecting jurors. They stated that their only objective had been to select those whom they thought were best qualified. This testimony is not enough to overcome the petitioner's case. As the Court said in *Norris* v. *Alabama:*

> "That showing as to the long-continued exclusion of negroes from jury service, and as to the many negroes qualified for that service, could not be met by mere generalities. If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for

---

[13] R. 34.

[14] R. 55. The parties also stipulated that there were no persons of Mexican or Latin-American descent on the list of talesmen. R. 83. Each item of each stipulation was amply supported by the testimony adduced at the hearing.

> the complete exclusion of negroes from jury service, the constitutional provision . . . would be but a vain and illusory requirement." [15]

The same reasoning is applicable to these facts.

Circumstances or chance may well dictate that no persons in a certain class will serve on a particular jury or during some particular period. But it taxes our credulity to say that mere chance resulted in there being no members of this class among the over six thousand jurors called in the past 25 years. The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner. The judgment of conviction must be reversed.

To say that this decision revives the rejected contention that the Fourteenth Amendment requires proportional representation of all the component ethnic groups of the community on every jury [16] ignores the facts. The petitioner did not seek proportional representation, nor did he claim a right to have persons of Mexican descent sit on the particular juries which he faced. [17] His only claim is the right to be indicted and tried by juries from which all members of his class are not systematically excluded— juries selected from among all qualified persons regardless of national origin or descent. To this much, he is entitled by the Constitution.

*Reversed.*

---

[15] 294 U. S., at 598.

[16] See *Akins* v. *Texas,* 325 U. S. 398, 403; *Cassell* v. *Texas,* 339 U. S. 282, 286–287.

[17] See *Akins* v. *Texas, supra,* note 16, at 403.