Edward Martinez CERDA, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–81–0108–CR.

Court of Appeals of Texas, Amarillo.

Dec. 2, 1982.

Cox & Hurt, Steve L. Hurt, Plainview, for appellant.

Marvin Marshall, Dist. Atty., Plainview, for appellee.

Before REYNOLDS, C.J., and COUNTISS, J.

REYNOLDS, Chief Justice.

In a Hale County jury trial, Edward Martinez Cerda was convicted of the offense of felony theft. Punishment was assessed by the jury at five (5) years confinement and a fine of $1,500.

Appellant does not question the sufficiency of the evidence which, in brief, shows that the victim of the theft testified at trial and identified appellant as the person who appropriated his property without his effective consent. Appellant does question, in his first three grounds of error, the selection of the jury and a procedural aspect of the trial. We cannot agree, as later explained, that error is shown under any of these grounds.

He also charged, by his fourth ground, that the trial court committed reversible error in overruling his motion to quash the

indictment when he proved that the Mexican-American class of which he is a member was systematically excluded from the selection of grand juries in Hale County. We agree that the unrebutted prima facie case of purposeful discrimination shown in the selection of grand juries requires a reversal of the judgment of conviction and a dismissal of the indictment.

## Part I

In Part I of this opinion we simply note that appellant's first three contentions of reversible error are not supported by the record and applicable law. There is no uniqueness in the evidential record, and the issues presented have been settled adverse to appellant's contentions; therefore, the rationale for overruling the first three grounds of error is relegated to an unpublished Appendix to Part I of this opinion. Tex.Cr.App.R. 207(a).

## Part II

Appellant was indicted in 1979 by a Hale County grand jury. The grand jurors were impaneled from a list of prospective jurors selected by jury commissioners who were appointed by a district judge. The system for selecting grand jurors, called the "key man" system in *Castaneda v. Partida,* 430 U.S. 482, 484, 97 S.Ct. 1272, 1275, 51 L.Ed.2d 498 (1977), and accepted as facially constitutional, *Id.,* 430 U.S. at 497, 97 S.Ct. at 1281, was shown to have been used in Hale County for at least eleven years, from 1969 to 1979, at the time of appellant's indictment.[1]

Asserting that the grand jury selection system denied him equal protection of law, appellant moved the trial court to quash the indictment. The denial occurred, appellant alleged, because over a significant time, there had been a substantial underrepresentation of the Mexican-American class, to which he belongs, on Hale County grand juries. Hearing the evidence appellant adduced to support his motion, the court overruled the motion, after which, following a

jury trial, appellant was convicted of the felony offense for which he had been indicted.

Under his fourth ground of error, appellant contends that the court reversibly erred in overruling his motion to quash the indictment. He submits that he evidenced a prima facie case that an equal protection violation occurred in the use of the grand jury selection system and, his evidence being unrebutted by the State, he was entitled, by the authority of *Castaneda,* to have the indictment set aside. No brief has been filed on behalf of the State.

In *Castaneda,* the United States Supreme Court held that in order to establish a prima facie case of discrimination in the selection of grand jurors, a defendant must show three factors. The factors are: the group allegedly discriminated against is a recognizable, distinct class singled out for different treatment under the laws, as written or applied; the group is underrepresented on jury panels over a significant period of time; and the selection process is not racially neutral or is susceptible to being used as a tool of discrimination. *Id.,* 430 U.S. at 494, 97 S.Ct. at 1280.

With respect to the first factor, it is no longer open to dispute that Mexican-Americans are a clearly identifiable class. *Hernandez v. Texas,* 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954). And in connection with the third factor, the "key man" selection system used is not racially neutral with respect to Mexican-Americans because the Spanish surnames are easily identifiable, providing a discernible opportunity for purposeful discrimination. *Castaneda v. Partida, supra,* 430 U.S. at 495, 97 S.Ct. at 1280.

As his showing of the second factor that the class of Mexican-Americans has been underrepresented on grand jury panels over

---

1. After 27 August 1979, the jury panels in Hale County have been selected from voter registration lists by use of the jury wheel. Tex.Rev. Civ.Stat.Ann. art. 2094, *et seq.* (Vernon Supp. 1982). This selection system, which eliminates the "key man" system, has been upheld, *United*

*States v. Arlt,* 567 F.2d 1295, 1297 (5th Cir.), *cert. denied* 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 412 (1978), even though the voter registration list may not accurately represent a fair cross section of the community. *United States v. Goff,* 509 F.2d 825, 827 (5th Cir.1975).

a significant period of time, appellant relied on demonstrative evidence complemented by explanatory testimony. The demonstrative evidence consisted of the 1970 census records, the 1969–70 and 1979–80 school enrollment records, and the grand jury panels for the eleven-year period from 1969 to 1979, as they pertained to Hale County.

According to the 1970 census, Hale County had a total population of 34,137, of which 8,382, or 24.55%, were Spanish surnamed. As of the 13 October 1980 trial date, the official 1980 census figures had not been officially released, and appellant interpreted the percentage of Mexican-Americans in the 1979–80 county population from school enrollment records.

■ The 1969–70 school enrollment records revealed an enrollment of 6,455 students and that, by surname identification, Mexican-Americans comprised 28.74% of the enrollment. Thus, within the time frame of the 1970 census, the ratio of Mexican-American students enrolled in the school system was 14.57% greater than the ratio of Mexican-American inhabitants in the county. The 1979–80 school enrollment record reflected a decrease in total enrollment to 6,125 students, but that, again by surname identification, the Mexican-American student ratio had increased to 44.51% of the student body. Hence, by projective application of the 14.57% Mexican-American student-inhabitant ratio in 1970, to the then

current 44.51% ratio, Mexican-Americans comprised 38.03% of the county population in 1979–80 at the time the indictment was returned against appellant. Not only is the calculation of the Mexican-American percentage of the 1979–80 county population unchallenged by the State,[2] but an inquiry whether the arithmetically computed ratio was validated by the subsequent 1980 census figures is foreclosed to us, because we are bound by the record made in the trial court as presented to us in the appellate record. *Evans v. State*, 622 S.W.2d 866, 868 (Tex.Cr.App.1981).

As a predicate for showing that the Mexican-American class had been underrepresented on grand jury panels over a significant time, appellant introduced the official grand jury venire from which were selected the grand jurors who returned the indictment against him. The venire was 25% Mexican-American, a disparity of 13.03% from the 38.03% Mexican-American composition of the county population.[3] The grand jury list revealed that the grand jurors selected from the venire were 16.67% Mexican-American, an unexplained disparity of 21.36%,[4] which confers relevancy upon the composition of the grand juries for the ten preceding years.[5] *Espinoza v. State*, 604 S.W.2d 908, 909–10 (Tex.Cr.App.1980).

Unless otherwise explained, the two grand jury venires for 1969, the first year of the eleven-year period, would be expect-

**2.** The State did inquire whether, and received an affirmative answer that, there was a possibility that some persons with Spanish surnames in actuality would not be Mexican-Americans. Clearly, the possibility exists; but, even aside from the equal possibility that some persons with non-Spanish surnames actually would be Mexican-Americans, the inquiry and answer, without more, cannot be credited, for Spanish surnames provide ready identification of the members of the Mexican-American class. *Hernandez v. Texas*, 347 U.S. 475, 480 n. 12, 74 S.Ct. 667, 671 n. 12, 98 L.Ed. 866 (1954).

**3.** The percentage disparity of 13.03%, the difference between the percentage of the class in the population and the percentage of the class on the grand jury venire, is the disparity noticed by the United States Supreme Court in grand jury discrimination claims. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct.

1272, 51 L.Ed.2d 498 (1977), and cases there cited. Appellant, applying the more revealing disparity calculation illustrated by the dissenting opinion in *Espinoza v. State*, 604 S.W.2d 908, 911 *et seq.* (Tex.Cr.App.1980), computes a 34% disparity in the composition of the grand jury venire.

**4.** By the disparity calculation in *Espinoza* mentioned in marginal note 3, appellant computes a 56% disparity in the composition of the grand jury which returned the indictment against him.

**5.** Absent a showing by the State why the eleven-year period, from 1969 to 1979, is not reliable, the time period is accepted as the relevant base for comparison. *Accord, Castaneda v. Partida, supra*, 430 U.S. at 496, 97 S.Ct. at 1281.

ed to show that, by random selection, 25% of those summoned for grand jury service were Mexican-American; however, the venires disclosed that no Mexican-American was summoned on the first venire, a disparity of 100%, and only two Mexican-Americans were summoned on the second venire, a disparity of 14.55%[6] in relation to the 24.55% Mexican-American composition of the county population in 1970. Likewise, the two grand jury venires for 1979, the last year of the eleven-year period and the year in which appellant was indicted, would be expected to show that, by random selection, 38% of those summoned were Mexican-Americans; however, the venires show that four and five Mexican-Americans were summoned on the respective venires, resulting in disparities of 18.03% and 13.03%, respectively,[7] from the 38.03% Mexican-American composition of the 1979–80 county population.

Similarly, the grand jury venires and lists for the 1969–1979 eleven-year period would be expected to show that, by random selection, of the persons summoned for service and selected to serve, Mexican-Americans constituted 31.29%, the mean percentage (24.55% + 38.03% ÷ 2 = 31.29%) of their population ratios in 1970 and 1979–80. Yet, only 63 out of 440 persons summoned in the eleven years, or 14.32%, were Mexican-American, a mean disparity of 16.97%.[8] And out of the 63 summoned, only 30, or 15%, were shown to have served among the 200 grand jurors selected, a mean disparity of 16.29%.[9]

The United States Supreme Court never has announced mathematical standards for the demonstration of a denial of constitutional due process and equal protection by the "systematic" exclusion of an identifiable class from jury service, *Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972); yet, the Court has declared that under racially non-neutral selection procedures, as the system used here has been held to be, a sufficiently large disparity over a significant period of time supports the presumption of unconstitutional purposeful discrimination raised by the statistical showing. *Castaneda v. Partida, supra,* 430 U.S. at 493–94, 97 S.Ct. at 1279–80. Consequently, the Court has held that disparities less than the continuing underrepresentation shown here, *i.e.,* the mean disparity of 16.97% spanning eleven years, were significant enough to establish a prima facie case of discrimination against Mexican-Americans in grand jury selection. *Id.* at 496, 97 S.Ct. at 1281.

■. Although we are concerned that appellant's proof is based on gross population statistics and not, as we think it should have been, on *eligible* population statistics, nevertheless, the United States Supreme Court, in considering the question of purposeful discrimination in *Castaneda v. Partida, supra,* opted for the gross population statistics in preference to the eligible population statistics urged in The Chief Justice's dissent. Accordingly, once appellant estab-

6. Again, by the disparity calculation in *Espinoza* mentioned in marginal note 3, appellant computes a 72% disparity in the composition of the second grand jury venire for 1969.

7. And again, by the disparity calculation in *Espinoza* mentioned in marginal note 3, appellant has computed disparities of 47% and 34%, respectively, in the compositions of the two grand jury venires for 1979.

8. Absent an explanation for this disparity, a binomial distribution reveals that it is unlikely that a truly random and impartial system would have produced it. Generally, for a sample of this size, some fluctuation from the expected number is predicted, but if the observed number is greater than two or three standard deviations, the jury drawing is suspect. The

predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample (here 440) times the probability of selecting a Mexican-American (0.313) times the probability of selecting a non-Mexican-American (0.687). Thus, here, the standard deviation is almost ten, but the observed deviation is (440 × 0.313 = 137.7 − 63 =) 74.7, over seven times the standard deviation. *See Castaneda v. Partida, supra,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17.

9. And once again, by the disparity calculation in *Espinoza,* appellant has computed a 68.81% mean disparity in the composition of the grand juries for the eleven-year period.

lished the underrepresentation of his class over a significant period of time by use of the gross population statistics, thereby evidencing a prima facie case of discriminatory purpose, the State had the burden to rebut the case. *Id.* at 495, 97 S.Ct. at 1280. However, the State offered no evidence to dispel the presumption of intentional discrimination, *i.e.,* to explain the disparities, evinced by appellant's prima facie case.

Therefore, since the State failed to rebut with any competent evidence the prima facie case of purposeful discrimination evinced by appellant, we are compelled to sustain appellant's fourth ground of error by which he contends he was denied equal protection of the law in the grand jury selection process. *Id.* at 501, 97 S.Ct. at 1283. We must do so, although we, as former trial judges, are personally aware of many factors in the selection process used in this cause, but not shown by the State, that could materially alter the disparity percentages shown.

The judgment of conviction is reversed, the indictment is declared void, and the prosecution is ordered dismissed. *Stoker v. State,* 169 Tex.Cr.R. 59, 331 S.W.2d 310, 311 (Tex.Cr.App.1960).

BOYD, J., not participating.