*924 OPINION OF THE COURT
Dominic R Massaro, J.
At issue is whether the within defendant has exercised peremptory challenges to strike potential jurors for reasons that implicate equal protection concerns (see, Batson v Kentucky, 476 US 79 [1986]).
I. Background
During voir dire at his trial for four counts of assault (Penal Law § 120.10 [1], [2]; § 120.05 [1], [2]) and one of weapons possession (Penal Law § 265.01 [1]), Narine Rambersed, a citizen of Guyana, inter alia, exercised a pattern of peremptory strikes against all prospective jurors of apparent or conceded Italian descent. The prosecution voiced a prima facie Batson challenge. Defendant argues with novelty that Americans of Italian descent are not members of a "cognizable racial group” warranting protection from discrimination under Batson; and, therefore, no requisite showing need be made by him to provide racially neutral explanations for his challenges. This is a case of first impression in New York.[1]
Mr. Rambersed’s argument is unpersuasive. The exclusion of an otherwise qualified class of jurors from the right of every citizen to perform jury service would be an intolerable burden on a fundamental entitlement, and an unacceptable impairment of the integrity of our system of justice.
II, Batson and its Progeny
The rule is well settled that prosecutors may not exercise peremptory strikes to exclude prospective jurors on the basis that they and a defendant share the same race (see, Batson v Kentucky, supra; People v Hernandez, 75 NY2d 350 [1990], affd 500 US 352 [1991]; People v Scott, 70 NY2d 420 [1987]). Subsequent to Batson, the Supreme Court modified its pronouncement. In Powers v Ohio (499 US 400 [1991]), the Court held that a criminal defendant, even though he is not of the same background, may assert a Batson claim to the race-based exclusion of potential jurors.
The holding of Batson (supra) has also been applied in the reverse: to preclude criminal defendants from using peremp *925 tory strikes in a racially discriminatory manner (see, Georgia v McCollum, 505 US 42 [1992]; People v Kern, 75 NY2d 638, cert denied 498 US 824 [1990]; People v Mondello, 191 AD2d 462 [1993]). This extrapolation of the Batson rule is based on the equal protection guarantees of the United States Constitution (see, Georgia v McCollum, supra), and on the Equal Protection and Civil Rights Clauses of the New York State Constitution (see, People v Kern, supra).
While the primary holding in Batson (supra) was intended to protect the rights of a defendant, "the Court [also] recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminate^] against the excluded juror” (see, Batson v Kentucky, 476 US 79, 87, supra). In virtually every variation of the Batson situation, the central concern is this right of citizenship to serve on a jury (see, e.g., Georgia v McCollum, supra; Powers v Ohio, supra; People v Kern, supra; see also, Strauder v West Virginia, 100 US 303 [1879]). Reduced to their essential terms, these precedents make clear that no matter what the factual context, neither the prosecution nor the defense can utilize the mechanism of peremptory strikes to exclude persons of a particular race from jury service. Thus, Batson and its progeny represent a significant step in eradicating all forms of discrimination in jury selection procedures.
It must be remembered that a Batson challenge is a three-step process. First, the relevant circumstances must raise an inference that peremptory strikes are being utilized by an opposing party for discriminatory purposes. Second, once a prima facie showing has been made out, the burden shifts that a neutral explanation be articulated by said party for challenging the jurors in question. Finally, the court must determine whether the proferred reasons are pretextual. In this case, the threshold for the first prong, that is, "demonstrating that members of a cognizable racial group have been excluded” to support the claimed impermissibility is placed at issue (see, People v Childress, 81 NY2d 263, 266 [1993]).
III. Cognizability
The standard for determining cognizability for equal protection objections to peremptory strikes during jury selection under Batson (supra) is set out in Castaneda v Partida (430 US 482 [1977]). Cognizable is any group that is "a recognizable, distinct class, singled out for different treatment under the laws, as written or applied” (Castaneda v Partida, supra, at *926 494; see also, United States v Dennis, 804 F2d 1208 [11th Cir 1986], cert denied 481 US 1037 [1987]).
"Italian-Americans are' 'recognizable’ and 'distinct,’ and appear to have been 'singled out for different treatment under the laws, as written or applied.’ * * * Italian-Americans share a common ancestry * * * a common cultural and religious heritage * * * and they often still share a common language. They are identifiable, in part, by their characteristic last names. The court takes judicial notice that Italian-Americans are considered * * * to be a recognizable and distinct ethnic group, commonly identified by their last names and by their neighborhoods. These qualities are sufficient to render Italian-Americans no less cognizable than the other groups who have already been recognized as cognizable for equal protection purposes * * *
"Italian-Americans are also shielded by the equal protection clause’s prohibition against discrimination on the basis of ancestry. [Citations omitted.] In Hernandez [Hernandez v Texas, 347 US 475 (1954)], the Court * * * rejected the notion that only two 'racial’ groups, white and black, are deserving of equal protection. Rather, '[t]he exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment.’ Hernandez, 347 U.S. at 479, 74 S.Ct. at 671 * * * See Castaneda, 430 U.S. at 495, 97 S.Ct. at 1280.” (United States v Biaggi, 673 F Supp 96, 101-102 [ED NY 1987], affd 853 F2d 89 [2d Cir 1988], cert denied 489 US 1052 [1989].)[2]
In Biaggi (supra), while the court accepted the prosecution’s racially neutral explanations for exercising said challenges, it held for the proposition that Italian-Americans constitute a cognizable racial group, satisfying the threshold issue herein presented. In reaching this decision, two strands of reasoning were followed. The first strand traced the meaning of "racially cognizable group” under Batson (supra) and related cases; the second traced the meaning of that term in light of recent Supreme Court definitions of "race” for purposes of national origin discrimination (see, Saint Francis Coll, v Al-Khazraji, 481 US 604 [1987]; Shaare Tefila Congregation v Cobb, 481 US 615 [1987]).
In fact, the Supreme Court has consistently equated claims of national origin discrimination with claims of racial discrimi *927 nation for purposes of equal protection analysis, and stated that discrimination based on national origin, like that for racial discrimination, is subject to the most exacting judicial scrutiny.
The Biaggi court, in using the Castaneda standard, refused to follow United States v Sgro (816 F2d 30 [1st Cir 1987]), which held that for purposes of Batson (supra) under the Sixth Amendment, Italian-Americans were not a cognizable racial group.[3] Distinguishing Fourteenth Amendment jurisprudence, in the alternative the court adopted the Sgro criteria and likewise found that Italian-Americans are cognizable. In its analysis of cognizability, the Sgro court set out that: "(1) the group must be definable and limited by some clearly identifiable factor, (2) a common thread of attitudes, ideas or experiences must run through the group, and (3) there must exist a community of interests among the members, such that the group’s interests cannot be adequately represented if the group is excluded from the jury selection process.” (United States v Sgro, 816 F2d 30, 33, supra.) The Biaggi court held that Italian-Americans satisfy the Sgro standard:
"[0]bservable, distinguishable names constitute a clearly identifiable factor * * *
"Italian-Americans share a common experience and background in their links to Italian families, Italian culture, and Italian group loyalties, and often share the same religious and culinary practices. The court takes judicial notice that Italians have been subject to stereotyping, invidious ethnic humor and discrimination * * *
"Like any group recently emigrated from a cohesive nation, Italian-Americans share numerous common 'threads’ of attitudes, ideas and experiences, often including largely intertwined family relations * * * Finally, Italian-Americans have a community of interest: they generally share certain cherished values received through generations of Italian civilization and religion, including values relevant to moral culpability. Across *928 the board exclusion of this group could not but impair the representation of these interests in juries” (United States v Biaggi, 673 F Supp 96, 100-101, supra).
IV. Nationality as Race[4]
The Biaggi court turned to Saint Francis Coll, (supra) and Shaare Tefila (supra) to buttress its holding. Noting that Italian-Americans are "shielded by the equal protection clause’s prohibition against discrimination on the basis of ancestry” (United States v Biaggi, 673 F Supp 96, 101, supra), it extrapolated from Saint Francis Coll, ’s review of the 19th century scholarly definition of race and the legislative history of post-Civil War statutes, to find "the definition of 'cognizable racial groups’ under Batson cannot reasonably be restricted to exclude ethnic[s]. It is now recognized that the legislation enacted shortly after the Civil War to prohibit race discrimination, including the enabling legislation of the equal protection clause of the Fourteenth Amendment, was intended to protect a variety of groups not now labeled 'races.’ ” (United States v Biaggi, 673 F Supp 96, 102, supra.)
In considering the 19th century understanding of race, a simplistic, but nonetheless illuminating, answer can be found by reference to dictionaries and encyclopedias of the time. Indeed, the Supreme Court has suggested that the term be defined by resort to its common perception (see, United States v Thind, 261 US 204 [1923]). Surveying these definitions of race from the Reconstruction era amendments and enabling legislation, the Saint Francis Coll, (supra) and Shaare Tefila (supra) Courts acknowledged a virtual consensus that race at the time meant national origin. "Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time” (Saint Francis Coll, v Al-Khazraji, 481 US 604, 610, supra). "[The law] 'intended to protect from discrimination identifiable classes of persons * * * solely because of their ancestry or ethnic characteristics.’ ” (Shaare Tefila Congregation v Cobb, 481 US 615, 617, supra.)
*929 Webster’s Dictionary of 1887, for instance, proved insightful: "[t]he descendants of a common ancestor; a family, tribe, people or nation, believed or presumed to belong to the same stock” (Webster, Dictionary of English Language 589 [Wheeler ed 1887]; see also, American Dictionary of English Language [NY 1830]; Dictionary of English Language [New Haven 1841]; Chambers’ Etymological Dictionary of English Language [London 1871]). Included among ethnic "races” in 19th century encyclopedias (e.g., Encyclopedia America [1858]; New America Cyclopedia [1863]; Encyclopedia Britannica [1878]) are a host of ethnic groups, including "Italians”. It is not until the 20th century that scholarly works begin to refer to what today is the popular understanding that there are three major races— Caucasoid, Mongoloid and Negroid, rigid classifications criticized by biologists "as arbitrary and of little use in understanding the variability of human beings” (Saint Francis Coll, v Al-Khazraji, 481 US 604, 610, n 4, supra).
A cursory review of the relevant sociological and anthropological literature reinforces, rather than undermines, the often invisible link between race and national origin, emphasizing such factors as geographic distribution and culture in race formation. The Harvard Encyclopedia of American Ethnic Groups has merged the lines by purposefully blurring the distinction (see, Harvard Encyclopedia of American Ethnic Groups [Themstrom ed 1980]). The notion of race, then, it would appear, is as variable as man’s prejudice; and prejudice is as irrational as is society’s selection of groups against whom it is directed.
Turning to the legislative history of America’s first Civil Rights Act, that of 1866, which was enacted to further the protections of the Thirteenth Amendment (1865), finds it replete with references to a broad scope encompassing "all persons” (Civil Rights Act of 1866, 14 US Stat 27, Pub Acts of 39th Cong, ch XXXI). "[T]he statutory structure and legislative history persuade * * * that the 39th Congress was intent upon establishing * * * a broader principle then would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves” (McDonald v Santa Fe Trail Transp. Co., 427 US 273, 296 [1976]; Cong Globe, 39th Cong, 1st Sess 211, 238, 251, 438, 498, 499, 504, 523, 542, 1118, 1292, 1293, 1294 [1866]).
Likewise, the legislative history of the Fourteenth Amendment (1868) illustrates beyond doubt that the amendment was designed to insure that the 1866 Act’s principles enjoyed constitutional validity (see, Cong Globe, 39th Cong, 1st Sess *930 2462, 2467, 2468, 2498, 2501, 2590, 2511, 2534, 2538, 2539, 2549, 2961, 3031 [1866]; see also, Yick Wo v Hopkins, 118 US 356 [1886]).
Following ratification of the Fifteenth Amendment (1870), Congress passed the Enforcement Act of 1870, essentially reenacting the 1866 statute and making clear its ambit extended to nationality groups (see, Enforcement Act of 1870, 16 US Stat 140, Pub Acts of 41st Cong, ch CXIV; Cong Globe, 41st Cong, 2d Sess 1536, 3658, 3808, 3871 [1870]; see also, United States v Wong Kim Ark, 169 US 649 [1898]).
The legislative history of major 19th century civil rights enactments "embrace[s], at the least, membership in a group that is ethnically * * * distinctive” (Al-Khazraji v Saint Francis Coll., 784 F2d 505, 517 [3d Cir 1986], cert granted 479 US 812 [1986]). In light of the dialectic of historical realities, it can assuredly be concluded that for equal protection jurisprudence Batson (supra) supports an expansive construction of the meaning of "cognizable racial group” that is inclusive of a variety of ethnic and ancestral groups subject to intentional discrimination, including Americans of Italian descent.
V. New York Prohibition
Moreover, racially based peremptory strikes are violative of both the Equal Protection Clause and the Civil Rights Clause of the New York State Constitution (see, People v Kern, 75 NY2d 638, supra). Article I, § 11 of the NY Constitution contains two provisions. The first provision, the "Equal Protection Clause”, provides that "[n]o person shall be denied the equal protection of the laws”. The second provision, the "Civil Rights Clause” provides that "[n]o person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights” (NY Const, art I, § 11).
In regard to the Equal Protection Clause, which is modeled on the Fourteenth Amendment, the Kern Court concluded that race-based peremptory strikes interfere with this guarantee (cf., Matter of Esler v Walters, 56 NY2d 306 [1982]; People v Hernandez, 75 NY2d 350, supra). Our high Court has stated succinctly that "we have frequently applied the State Constitution, in both civil and criminal matters, to define a broader scope of protection than that accorded by the Federal Constitution in cases concerning individual rights and liberties” (People v P.J. Video, 68 NY2d 296, 303 [1986], cert denied 479 US 1091 [1987]).
Jury service is thus a privilege (as well as a duty) of citizenship protected under the State Constitution. According to the *931 1938 New York State Constitutional Convention, the term "civil rights” was interpreted to mean such rights defined by other provisions of the Constitution, statute or common law (4 Revised Record of NY State Constitutional Convention, 1938, at 2626). In Kern (supra), the New York Court of Appeals held that racially based peremptory challenges are prohibited under the Civil Rights Clause of the State Constitution because it is expressly " 'elsewhere declared’ ” (People v Kern, 75 NY2d 638, 651, supra), that is, under the Civil Rights Law (see also, Dorsey v Stuyvesant Town Corp., 299 NY 512, 531 [1949], cert denied 339 US 981 [1950]).
This statute, entitled "Right to serve on juries”, provides, in pertinent part, that "[n]o citizen of the state * * * shall be disqualified to serve as a * * * juror in any court * * * on account of race, creed, color, national origin or sex” (Civil Rights Law § 13). While the classification of race is enumerated in both the Civil Rights Clause of the Constitution and this statute, the Civil Rights Law clearly and unambiguously sets forth "national origin” as a protected classification. Applying the rationale in Kern (supra), it follows logically that such discrimination, standing alone, is constitutionally prohibited.
Section 1 of article I of the State Constitution further provides that, "[n]o member of this state shall be * * * deprived of any of the rights or privileges secured to any citizen thereof’. (NY Const, art I, § 1.)
VI. Conclusion
Italian-Americans descend from an old and acknowledged civilization. Throughout New York, some 350 Italian-American organizations expressing group affirmation seek to disseminate the values of this heritage.[5] Be that as it may, since their arrival in significant numbers a century ago, from a common ancestral homeland with a distinct language, religious belief and customary practice, Italian-Americans have been subjected to a long and painful history of purposeful unequal treatment.[6] From a purely legal perspective, it is beyond cavil that discrimination on the basis of national origin is indistinguishable from and as reprehensible as racial discrimination.
A plethora of studies on the Italian-American saga is filled with chapters of unbounded rage and unfettered bigotry: lynch *932 ings at the hands of lawless mobs,[7] condemnations from the pens of leading intellectuals,[8] quotas by enactments of the Federal Government,[9] miscarriages of justice by the deliberations of prejudiced courts,[10] internments by the force of martial law.[11] Instances of discriminatory treatment against Italian-Americans are extant to the present day.[12] Likewise, Italian-Americans continue to be subjected by the media to disabilities on the basis of a continuing stereotypical characterization of criminality that denigrates their citizenship, drains their dignity and flies in the face of their reality.[13] Against this background of struggle — bleak experiences that have, and continue to be, shared by other groups — Italian-Americans have relied on a common cultural patrimony, traditions and history to make important contributions to the moral, material and intellectual well-being of the commonweal. In recognition of these qualities, "Italian Heritage and Culture Month” is officially proclaimed each October.
*933 Defining racial groups is, at best, a task fraught with peril. The word "race” unquestionably contains "many levels of meaning, scientific, administrative and popular. The meanings are diverse, even contradictory” (Simpson and Yinger, Racial and Cultural Minorities: An Analysis of Prejudice and Discrimination, at 27 [NY 1987]). Transcending all the institutional and ideological differences which the word implies is the universal commonality of individual worth. Notwithstanding, Batson (supra) has assigned to the judiciary the unseemly task of identifying racial characteristics for the higher purpose of imposing sanction, moral by reference as well as legal, where protection against intolerance of a particular identification in jury selection requires it.
Beyond the question of cognizability through distinctiveness and proof that a group has historically been or is subject to discriminatory treatment, then, is the fact that impermissible discrimination occurs whenever a party is permitted to systematically exclude citizens of any background from jury service under a pattern of peremptory strikes for reasons not related to a perception that the individual member would be unable to adequately perform the functions and duties required of a juror in the case presented. Accordingly, the failure to provide sufficiently neutral explanations for such challenges— where, as here, a prima facie showing of discrimination against Italian-Americans has been made out — can only result in unrepresentative juries and impair the integrity of the judicial system. Section 500 of the Judiciary Law provides "that all litigants * * * entitled to trial by jury shall have the right to * * * a fair cross-section of the community” (Judiciary Law § 500).
This case implicates fundamental policies of the State of New York; it therefore requires the heightened scrutiny afforded distinctions where core guarantees are at stake. In a State such as ours that celebrates diversity and applauds multiculturalism, where Italian-Americans are a vital part of the tapestry of its life,[14] it would be untenable not to suggest what should be axiomatic: that they are sufficiently cohesive to warrant cognizability[15] in meeting the threshold requirement of Batson (supra) for purposes of protection against prejudices *934 that would otherwise deny them a fundamental right, and the community at large the benefit of their participation in the fair administration of justice.[16]

. In People v Liguori (149 AD2d 624, 625 [2d Dept 1989]), the Court declined to decide the question: "Even if we were to assume that the rule of Batson v Kentucky (supra) applies to claims of discrimination on nonracial lines, the defendant failed to request an evidentiary hearing on the issue”.

. Biaggi (supra) has been cited with approval in United States v Di Pasquale (864 F2d 271 [3d Cir 1988]).

. "The Sgro court’s borrowing act is initially suspect because the Supreme Court in Batson quite clearly commanded that Castaneda govern its own use of the term 'cognizable racial group.’ * * *
"Furthermore, there is an important difference between the meaning of cognizability in these two different contexts. Discrimination against a group in the cross-section of the venire, in violation of the Sixth Amendment, may be demonstrated by mere statistical underrepresentation of that group * * * Discrimination in the use of peremptory challenges in violation of the equal protection clause, by contrast, necessitates a showing of the 'essential element’ of 'discriminatory purpose.’ ” (United States v Biaggi, 673 F Supp 96, 100, supra.)

. For a detailed discussion of the 19th century conception of race as ethnicity or ancestry, see Munafo, National Origin Discrimination Revisited, 34 Cath Law 271 (1991). The author’s earlier treatment of the subject of selective interpretation of civil rights legislation (i.e., "different treatment under the law, as written or applied”) is noteworthy: Munafo, National Origin Discrimination Against Americans of Southern and Eastern European Ancestry: A Review of the Legal History and Judicial Interpretations, 25 Cath Law 50 (1979).

. See, Directory of Italian American Associations in Tri-State Area (NY, Center for Migration Studies 1989).

. See, e.g., LaGumina, W.O.P.: A Documentary History of Anti-Italian Discrimination in the United States (San Francisco, Straight Arrow Books 1973).

. See, e.g., Gambino, Vendetta (Garden City, Doubleday 1977). The first in a series of such incidents, the lynching of 11 Italians in New Orleans in 1891 stands as America’s most glaring example of mob justice.

. Madison Grant is representative of those "intellectuals” of the day who condemned the migration of Italians in particular to the United States based on racist theories.

. See, e.g., Immigration Act of 1924, 43 US Stat 153, Pub L of 68th Cong, ch 190. The discriminatory national origins quota system aspect of the law "as written” was not abolished until 1965.

. See, e.g., Commonwealth v Sacco and Vanzetti (Sup Ct, Norfolk County, Mass 1920, index Nos. 5545, 5546); transcript of record of trial of Niccola Sacco and Bartolomeo Vanzetti in courts of Massachusetts and subsequent proceedings, 1920-1927, 5 vols (NY, Henry Holt 1928-1929). In 1977, 50 years after their execution, Governor Michael Dukakis proclaimed that bigotry, and not evidence, was the overriding factor resulting in a guilty verdict(s).

. See, e.g., Fox, The Unknown Internment: An Oral History of Italian Americans During World War II (Boston, G.K. Hall & Co. 1990); US Commn on Wartime Relocation and Internment of Civilians: Papers (Washington, D.C., US Government Printing Office 1942).

. See, e.g., Scelsa v City Univ. of N. Y., 806 F Supp 1126 (SD NY 1992) (treating with a quarter century of de facto discrimination against Italian-Americans by the City University system).
The New York State Division of Human Rights reports 245 complaints of discrimination on the basis of national origin filed by Italian-Americans since 1988. This figure represents the largest number of complaints filed in a nontraditional minority category.

. See, e.g., generally, Commission for Social Justice, Order Sons of Italy in America, Washington, D.C., Americans of Italian Descent: A Study of Public Images, Beliefs and Misperceptions (Response Analysis Corp, Princeton 1991).

. United States Department of Commerce, Bureau of the Census (1990) reports that 2,843,872 Italian-Americans reside in New York State. This number represents 15.8% of the State population.

. See, e.g., National Italian American Foundation, Washington, D.C., Profile of Italian Americans: 1972-1991 (National Opinion Research Center, *934 U of Chicago 1992); The State Education Department/The University of the State of New York, Official Study Guide: Italian Americans (Albany 1992).

. "Then I, and you, and all of us fell down”. (Shakespeare, Julius Caesar, act III, scene ii.)